**Lawrence LEVINE, Walter Wax, Morris Kopel, M. G. Davis & Co., Inc., Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 362, Docket 34512.**

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1970.

Decided Jan. 6, 1971.

---

Arthur M. Handler, New York City (Golenbock & Barell, Seymour Kleinman, Arthur C. Silverman, Alan Kardon, New York City, of counsel), for petitioners.

David Ferber, Sol., S. E. C., Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, Richard E. Nathan, Sp. Counsel, Kathryn L. Powers, Atty., S. E. C., Washington, D. C., on the brief), for respondent.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

MOORE, Circuit Judge:

In this proceeding [1] the Securities and Exchange Commission (the Commission) revoked the broker-dealer registration of M. G. Davis & Co., Inc. (Davis). Lawrence Levine (Levine), Walter Wax (Wax), Morris Kopel (Kopel) and Harold R. Rosenberg (Rosenberg), the individual petitioners, were permanently barred from association with any broker-dealer except that Levine (after six months) and Wax, Kopel and Rosenberg (after three months) were allowed to seek permission to become associated with a broker-dealer in a non-supervisory capacity. Rosenberg does not seek review. The initial decision of the Hearing Examiner, the Findings, Opinion and Order of the Commission and the record upon which these decisions have been based have been reviewed. Substantial evidence supports the factual findings of Examiner and the Commission. The Commission's order is therefore affirmed.

Petitioners for their first point on appeal claim that they were deprived "of a fair hearing and their constitutional rights to due process of law." This generality is made more specific by the assertion that "The Commission's failure to make available to petitioners their own books and records—crucial to their defense—which books and records were accessible to the Commission" and which, they claim, had been inspected by the Commission and were unavailable to petitioners, constituted such deprivation. A brief analysis of the facts reveals the lack of merit to this claim.

1. The proceeding was brought by the Division of Trading and Marketing of the Commission. Petitioners have referred to this Division as the prosecutorial branch of the Commission as distinguished from the adjudicatory branch. We find no need in this opinion for this distinction and, hence, will use "Commission" unless otherwise noted.

This proceeding arose out of the activities of M. G. Davis & Co., Inc., a broker and dealer in securities, in connection with the offer and sale of stock of Cosnat Corporation (Cosnat). The individuals, Levine and Wax, were officers, directors and principal stockholders of Davis. Kopel and Rosenberg were registered representatives of Davis, Crerie & Co., Inc. (Crerie & Co.), Frank Crerie (Crerie), Mario Trombone Associates (Associates) and Mario Trombone (Trombone), originally parties to the proceeding, accepted various sanctions imposed by the Commission. However, a report (the Crerie Report) on Cosnat stock prepared and issued by Crerie & Co. and distributed by Davis is of importance in evaluating petitioners' claims.

The time period involved began in July 1963 and continued for several months thereafter. Critical to the knowledge of Levine and his associates of any false representations with respect to the sale of Cosnat stock are the Crerie Report, the information contained therein and their familiarity with Cosnat's business situation.

Prior to the preparation of the Crerie Report, a report or market letter on Cosnat had been issued by Meade & Co., a broker-dealer with whom Levine and Wax had been associated before joining Davis. Levine furnished the Meade Report to Crerie and was familiar with both Reports. Davis ordered some 3,000 copies of the Crerie Report and distributed some 300 to 500 copies to customers and prospective customers. Between July and November 1963 Davis sold approximately 37,000 shares of Cosnat stock to customers at prices varying from 2¾ to 10.

*Levine's Knowledge of Cosnat.*

Cosnat, incorporated in 1960, was originally engaged in the distribution of phonograph records. In 1961 it acquired two producing companies, the Monarch group. Large borrowings at high interest rates were necessary for this acquisition. Efforts in 1961–62 to obtain capital from a stock issue and convertible debenture issue or from institutional financing had failed. Merger negotiations with three other companies came to naught.

Levine had been an active participant in the Monarch acquisition and had been compensated therefor for his services. He was a close friend of Jerry Blaine, president of Cosnat. He knew the cost of the borrowing to acquire the Monarch group and assisted Blaine in trying to lower these costs including the abortive 6% debenture issue. With reference to Cosnat generally, Levine had testified: "Virtually every aspect of the company's operations were discussed with me." His personal contacts with Blaine gave him "very ready access, and it gave me [him] an insight into what I [he] felt I [he] was doing." As to the information contained in a memorandum which became in substance the Crerie Report, Levine "went over the document from the front line to the last line," had "an intimate working knowledge of the company" and "had a first hand knowledge of everything that was in there [the four page Crerie memorandum]."

█ Levine asserts that this intimacy gave him a right to rely on the statements of Cosnat's management concerning its business affairs, that he had no reason to doubt the accuracy of Cosnat's statements and that he (or any broker-dealer for that matter) was not required to go behind these statements. Of course, absent actual knowledge or warning signals, a broker-dealer should not be under a duty to retain his own auditor to re-examine the books of every company, the stock of which he may offer for sale, even accepting the doubtful hypothesis that such permission would be granted. However, each case must be decided on its own specific facts and here it is Levine's knowledge and opportunity for knowledge that are controlling.

In summary of the salient facts: Levine knew of Cosnat's large indebtedness,

its high interest charges, its need for financing, the importance of the prospective mergers to this financing, and the fact that earnings figures in the Crerie Report failed to reflect the deduction of nonrecurring special items although the Report stated the contrary. Easily capable of verification to one in Levine's special position were the GSA contract ($2 million in sales expected to be added), the moving picture venture, and the prospective listing of the Cosnat stock on a major stock exchange.

To this Levine replies that he did seek confirmation of these representations from Cosnat's management, that he had a reasonable basis for the recommendation of Cosnat stock and thus avoided the use of unconfirmed reports.

A review of the entire record discloses more than sufficient evidence to support the findings of the Hearing Examiner and the Commission as to the facts establishing Levine's knowledge or opportunity for knowledge. Wax, too, must be held responsible for the sales misrepresentations. He was an officer of Davis, distributed the Crerie Report to salesmen and customers and knew of the Report's falsity in certain matters. Kopel, a salesman, went even beyond the Crerie Report in representing that the Cosnat stock would "[p]ossibly within a year's time make probably about four or five points, * * *"; that Cosnat "was going on the American Stock Exchange;" that "it was going to go four times as high as it was right now" and that the rise would take "four to six months." The sanctions against Levine, Wax and Kopel are all supported by substantial proof.

■ The extent of Levine's knowledge of the facts is pertinent to petitioners' claim of a denial of a fair hearing. This claim is premised upon highly inaccurate fact assumptions. In 1963 the Attorney General of the State of New York (the Attorney General) had subpoenaed all Davis' books and records relating to Cosnat. No record of these books had been made by Davis and no receipt therefor obtained. Petitioners now claim that the subpoenaed material contained a "due diligence" file which would have established that they had investigated Cosnat's financial status and had sought to verify the information in the Crerie Report. But, as the Commission stated in its opinion, according to Levine's testimony the contents of the "due diligence" file consisted of annual reports, financial statements and releases, notes of conversations between Levine, Blaine and other officers of Cosnat and that most of these records were introduced in evidence and were available for petitioners' defense. Furthermore, there was no proof that these Davis records were in the possession or under the control of the Commission. Quite to the contrary they were in the possession of the Attorney General.

During the hearing a representative of the Attorney General's office stated that "the respondents [petitioners here] may examine any of the material belonging to them and turned over by them to the Attorney General's office." The only qualification was that the examination take place at the Attorney General's office. There is no showing that petitioners sought to take advantage of this offer or tried by any legal method to inspect the subpoenaed papers. In any event the record on review supports the Commission's finding that "Levine could not reasonably rely on such reports in view of his knowledge of adverse facts."

■ Lastly petitioners assert as error the Commission's ruling that petitioners could call only four customer witnesses in defense and that the testimony of forty-seven additional witnesses be excluded. The Commission's case was based upon the testimony of six customer witnesses who purchased Cosnat stock through Davis. The purpose of the testimony of the excluded forty-seven was to show that the Davis salesmen made no false or misleading statements in connection with Cosnat sales—hence, no scheme to defraud. An offer of proof to this effect was made. However, as the Commission found "the testimony of some customers that other misrepresen-

tations had not been made to them would not negate the testimony of the customers who testified that price predictions had been made to them."

Upon review pursuant to the petition therefor, the Commission's order is affirmed.