Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 22, 2004       Decided July 30, 2004

No. 03-1098

NICHOLAS P. HOWARD,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

————

On Petition for Review of an Order of the
Securities and Exchange Commission

————

*Paul Gonson* argued the cause for petitioner. With him on the briefs were *Charles R. Mills*, *David S. Versfelt*, and *Mary T. Ambron*.

*Randall W. Quinn*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Giovanni P. Prezioso*, General Counsel, *Meyer Eisenberg*, Deputy General Counsel, *Jacob*

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*H. Stillman*, Solicitor, and *Rada Lynn Potts*, Senior Litigation Counsel.

Before: HENDERSON, RANDOLPH, and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

RANDOLPH, *Circuit Judge*: Nicholas P. Howard petitions for review of a Securities and Exchange Commission order imposing sanctions on him for aiding and abetting alleged securities laws violations committed in the course of closing two private placement offerings of common stock in 1991 and 1992. The SEC's opinion holding Howard liable is confused and confusing. The SEC first held that "awareness of wrongdoing" is a necessary element of aiding and abetting, but it marshaled no evidence to show that Howard had any such awareness. The SEC then stated – inconsistently – that alleged aiders and abettors who act "recklessly" may be liable, but it never explained what it thought "recklessly" meant in this context; it disregarded evidence tending to show that Howard did not act recklessly as this court has defined the term; and it wound up applying a "should have known" negligence standard that we have rejected. Under a correct scienter standard the evidence is insufficient to sustain most of the charges against Howard. The record is unclear with respect to two others, which we remand to the SEC for reconsideration.

## I.

In the early 1990's Howard served as a senior vice president of James Capel, Inc. ("JCI"), a registered broker-dealer based in New York. JCI was a subsidiary of James Capel & Company, Ltd., a securities brokerage firm in London, which together with another affiliate, made up the Capel Group. Howard's job was to market European equity securities to American and Canadian institutional investors. In 1990, his customers became interested in investment opportunities cre-

ated by the fall of communism in Eastern Europe. Howard believed there would be demand for new hotels in the region, an idea that ultimately resulted in New Europe Hotels, N.V., a Netherlands Antilles corporation incorporated on December 20, 1990, for the purpose of developing hotel properties in Eastern and Central Europe. Howard became a director of the new company. Before its formation, he consulted with IDG Development Corporation, a real estate development company; executives from the Capel Group and its affiliates; and JCI's corporate finance department, headed by Joel Matcovsky – a former SEC lawyer. JCI accepted the project, and its corporate finance department took steps to initiate a stock offering.

The initial offering of 5,000,000 shares of common stock occurred in late 1990 and early 1991. JCI was the exclusive marketer of New Europe Hotels stock in the United States; its affiliates were the underwriters overseas. The law firm of Rogers & Wells prepared the offering documents for use in this country. Rogers & Wells began drafting the documents in the fall of 1990. Howard was not involved in the drafting process although he was apprised of developments. Matcovsky and the corporate finance department served as the liaison between JCI and Rogers & Wells.

The final placement documents – which Howard skimmed through but did not read closely – offered the stock on a "best efforts, part or none" basis. Under SEC Rule 10b–9, 17 C.F.R. § 240.10b–9, a part-or-none offering requires prompt refunds to investors if the minimum number of shares set forth in the offering is not sold, or full payment is not received, by the date specified. The first offering made closing contingent on the sale of at least 2,000,000 shares at 20 Deutsche Marks per share by January 2, 1991.

JCI began marketing the United States placement in late 1990. Howard headed the marketing effort here, telephoning potential investors and arranging road shows. Sales were not up to expectations. With concern growing that the minimum might not be met by the deadline, three transactions were

undertaken, each of which eventually led to an alleged violation of the securities laws.

On December 20, 1990, the Capel Group – at the behest of its co-chairmen – obtained for itself enough shares to close the offering. It did this by taking 100,000 shares in lieu of the fee it would have received for serving as the worldwide selling agent and by purchasing an additional 55,650 shares. Howard told the subscribers in this country, and potential investors, that the Capel Group had purchased these shares, viewing this as a "marketing plus." In making this representation, he did not say whether the shares would count toward the subscription minimum. Howard did not believe there were any legal problems with the Capel Group's purchases because he understood that Matcovsky had cleared the transactions with Rogers & Wells. Howard was on vacation during the week of the closing and played no role in determining which shares would be counted toward the minimum.

The next questioned transaction was a purchase by JCI. During the offering period Howard received an indication of interest for 30,000 New Europe Hotels shares from Julius Baer Securities on behalf of the European Warrant Fund, a closed-end investment company that Howard participated in creating. Baer served as the fund's investment adviser, and JCI served as a "subadviser." Howard was aware of these relationships. In the days before the closing, Howard was unable to reach Baer for confirmation. Howard checked with his supervisor, JCI's president Mark Green, who told him that JCI should itself purchase the stock. Before the closing, JCI did this and held the shares in a JCI-controlled account. JCI's 30,000 shares were counted toward the minimum. On January 4, 1991, two days after the closing, JCI sold the shares to the European Warrant Fund.

The third transaction involved the real estate developer, IDG Development Corporation. As disclosed in offering documents, IDG was to receive 75,000 shares free of charge as "founders shares" and had agreed to purchase another 75,000 shares on its own. The offer of free shares was rescinded after another investor objected. Unhappy with losing the

free shares, IDG asked if New Europe Hotels would advance IDG's managerial fees to ease a cash flow burden. Although a director of New Europe Hotels, Howard was on vacation at the time and did not participate in these discussions. In his absence, New Europe Hotels' board of directors approved a plan whereby the company would deposit an amount equal to IDG's fees in a bank that in turn would use the deposit as collateral for a loan to IDG. Matcovsky, who was also a director and participated in the meetings, called Howard, told him of the board's resolution, and represented that Rogers & Wells had been consulted and approved the transaction. Only then did Howard vote in favor of the plan. New Europe Hotels thus assisted IDG in obtaining two loans, which IDG used to buy the shares it was originally supposed to receive free of charge. These shares were counted toward the minimum.

Although the closing took place on January 2, 1991, it was not until several weeks later that full payment was made for up to a third of the shares, including those sold to IDG Development Corporation. In part this was due to conflicting instructions about where to wire payment. Howard learned of these problems when he returned from vacation on January 4 and assisted JCI's efforts to account for and collect the missing funds.

JCI initiated a second private placement offering of NEH securities in October and November 1991. As with the first offering, the corporate finance department coordinated the drafting of documents by Rogers & Wells. Howard relied on its work product and believed the offering materials contained all the necessary disclosures. The second offering closed on November 27, 1991.

The SEC charged Howard with willfully aiding and abetting and causing the securities violations committed by JCI and New Europe Hotels. In the SEC's view, the minimum subscription of 2,000,000 shares in the part-or-none offering was reached by improperly counting (1) shares the Capel Group purchased for itself, (2) shares JCI purchased for an aftermarket sale to the European Warrant Fund, and (3)

shares IDG purchased with bank loans using as collateral the fees New Europe Hotels advanced. These transactions were not, according to the SEC, "bona fide" under Rule 10b–9.[1] In addition, the SEC determined that antifraud violations occurred when the first offering closed despite the fact that payment had not been received for a third of the shares. JCI and New Europe Hotels thus violated § 10(b) of the Securities Exchange Act, and Rules 10b–5 and 10b–9 thereunder, and § 17(a) of the Securities Act.[2] The violation of Rule 10b–9 consisted of improperly closing the initial offering rather than returning the proceeds of the sales to the investors. The violations of Rule 10b–5 were the failure to disclose in the first offering that these purchases would be counted toward the minimum and the failure to disclose in the second offering that the first offering had closed improperly. The SEC also charged that JCI violated § 17(a)(1) of the Investment Company Act by selling securities to the European Warrant Fund, which it was advising.[3]

After an evidentiary hearing an Administrative Law Judge found that Howard had aided and abetted and caused these violations. The SEC agreed and suspended Howard from associating with any broker or dealer for three months,

---

[1] Rule 10b–9 is set forth *infra* note 12.

[2] Section 10(b) of the Securities Exchange Act prohibits the use of manipulative or deceptive devices in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b–5 prohibits, *inter alia*, the making of an untrue statement of a material fact in connection with a securities transaction. 17 C.F.R. § 240.10b–5. Section 17(a) of the Securities Act prohibits fraudulent conduct including the omission of material facts necessary to make statements not misleading in connection with the offer or sale of securities. 15 U.S.C. § 77q(a).

[3] Section 17(a)(1) of the Investment Company Act prohibits an affiliated person of a registered investment company, acting as a principal, from selling any security to that company. 15 U.S.C. § 80a–17(a)(1). Section 2(a)(3)(E) of the Act defines "affiliated person" of an investment company to include "any investment adviser thereof." 15 U.S.C. § 80a–2(a)(3)(E).

ordered him to cease and desist from committing any future violations, and assessed a civil penalty of $50,000.

## II.

Of the three sanctions imposed on Howard, one – the cease and desist order – stands apart. The SEC's authority to issue such orders against secondary actors rests on § 21C(a) of the Securities Exchange Act, 15 U.S.C. § 78u–3(a). This section states that if the SEC finds that any person has violated the Act or any rule or regulation thereunder, it may issue a cease and desist order against "any other person that . . . was . . . a cause of the violation, due to an act or omission the person knew or should have known would contribute to such violation. . . ." Although we held in *KPMG, LLP v. SEC*, 289 F.3d 109, 120 (D.C. Cir. 2002), that the "knew or should have known" language in § 21C embodied a negligence standard for purposes of that case, it does not necessarily follow that negligence is the standard here. The SEC's opinion in *KPMG*, which we sustained, held that "negligence is sufficient to establish 'causing' liability under Exchange Act Section 21C(a), at least in cases in which a person is alleged to 'cause' a primary violation that does not require scienter." *In re KPMG Peat Marwick LLP*, Exchange Act Release No. 43862, 2001 SEC LEXIS 98, at *82 (Jan. 19, 2001).[4] Unlike *KPMG*, scienter was an element of the primary violations that were the subject of the cease and desist order in this case. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).[5] This is apparently why the SEC did not cite its

---

[4] For securities violations, the Supreme Court has described scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

[5] We held in *Investors Research Corp. v. SEC*, 628 F.2d 168, 177 (D.C. Cir. 1980), that § 17 of the Investment Company Act contains no scienter requirement. But the SEC did not issue a cease and desist order against Howard with respect to § 17(a)(1). *In re Nicholas P. Howard*, Exchange Act Release No. 47357, 2003 SEC LEXIS 377, at *23 n.26 (Feb. 12, 2003).

opinion in *KPMG* or ours, and did not invoke negligence as the standard to be applied. The SEC proceeded instead on the basis that because Howard aided and abetted violations of the securities laws requiring scienter he was "a cause" of the violations under § 21C. *See In re Sharon M. Graham & Stephen C. Voss*, 53 S.E.C. 1072, 1085 n.35 (1998).

The SEC's authority to impose the other two sanctions – suspending Howard for three months and ordering him to pay a penalty of $50,000 – rested on Exchange Act provisions other than § 21C. Under § 15(b)(6) and § 15(b)(4) the SEC may suspend for up to twelve months any person associated with a broker or dealer who "has willfully aided, [and] abetted" any violation of the securities laws. 15 U.S.C. §§ 78*o*(b)(6)(A), 78*o*(b)(4)(E). Under § 21B, the SEC may impose money penalties against persons who have "willfully aided, [and] abetted" another's violation of the securities laws. 15 U.S.C. § 78u–2(a)(2).[6]

How does one decide whether a person willfully aided and abetted a securities violation? The "rules for determining aiding and abetting [securities violations] are unclear, in an area that demands certainty and predictability." *Central Bank of Denver*, 511 U.S. at 188 (internal quotations and citation omitted). Rather than bringing clarity to the subject, the SEC in this case muddied the waters. According to its opinion, an element "necessary to find that a respondent aided and abetted [the primary] violations" is "a general awareness by the aider and abettor that his role was part of an activity that was improper." *In re Nicholas P. Howard*, Exchange Act Release No. 47357, 2003 SEC LEXIS 377, at *14 (Feb. 12, 2003) ("Comm'n Op."). The "general awareness" language comes from this court's holding in *Investors*

---

[6] The Supreme Court held in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 191 (1994), a private action for damages, that Congress did not intend to impose aiding and abetting liability under § 10(b) of the Securities Exchange Act. Howard's exposure to a civil money penalty and suspension for aiding and abetting violations of § 10(b) stems not from § 10(b) itself, but from § 15(b) and § 21B.

*Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir. 1980),[7] which the SEC cited in a footnote. *Investors Research* explained that the "awareness of wrong-doing requirement" in aiding and abetting disciplinary cases was "designed to insure that innocent, incidental participants in transactions later found to be illegal are not subjected to harsh ... administrative penalties." 628 F.2d at 177.

Awareness of wrongdoing means knowledge of wrongdoing. *See id.* at 178 & n.61; *Central Bank of Denver*, 511 U.S. at 181; *Halberstam v. Welch*, 705 F. 2d 472, 478 & n.8 (D.C. Cir. 1983). Despite its holding that this was a "necessary" element of aiding and abetting liability,[8] the SEC never mentioned any evidence that Howard was aware of wrongdoing. Its opinion said only that Howard knew the first offering could not close unless 2,000,000 shares were sold, and that he knew the Capel Group and JCI engaged in efforts to reach that number through transactions which, the SEC charged, violated Rule 10b–9 when they were counted toward the minimum. Obviously, Howard also knew of the second offering, but again nothing indicated that he was aware of any illegalities in the first offering that had to be disclosed to potential investors in the second. As the SEC recognized, the "facts in this matter are largely undisputed," Comm'n Op., 2003 SEC LEXIS 377, at *3. Among those facts are these: "Howard did not know that his role was part of an overall activity that was improper," he "believed that the lawyers had been consulted," and he did not have a "high conscious intent." *In re Nicholas P. Howard*, Initial Decisions Release No. 138, 1999 SEC LEXIS 577, at *48, *19, *29, *30, *61 (Mar. 24, 1999) ("ALJ Dec.").

In short, the evidence showed that Howard was not aware, generally or otherwise, of any wrongdoing. To the extent the SEC explained itself, its point was the opposite – Howard's fault was in *not* being aware. In the sentence after it set

---

[7] *See also SEC v. Bilzerian*, 29 F.3d 689, 694 n.10 (D.C. Cir. 1994).

[8] The SEC held the same in *In re Russo Secs. Inc.*, 53 S.E.C. 271, 278 (1997), which its opinion in Howard's case also cited.

forth the elements of aiding and abetting, the SEC added that "[r]ecklessness is sufficient to satisfy the scienter requirement for aiding and abetting liability." Comm'n Op., 2003 SEC LEXIS 377, at *14. The quotation is an accurate statement of the law of this circuit, but it is inconsistent with the idea that knowledge of wrongdoing must be proven. A secondary violator may act recklessly, and thus aid and abet an offense, even if he is unaware that he is assisting illegal conduct. Two of our decisions, rendered after *Investors Research*, make this point. *Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000); *SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992). Both hold that "extreme recklessness" may support aiding and abetting liability. *Graham*, 222 F.3d at 1004; *Steadman*, 967 F.2d at 641. "Extreme recklessness" – or as many courts of appeals put it, "severe recklessness"[9] – may be found if the alleged aider and abettor encountered "red flags," or "suspicious events creating reasons for doubt" that should have alerted him to the improper conduct of the primary violator, *Graham*, 222 F.3d at 1006; *see also Wonsover v. SEC*, 205 F.3d 408, 411 (D.C. Cir. 2000), or if there was "a danger . . . so obvious that the actor must have been aware of" the danger. *Steadman*, 967 F.2d at 641–42, quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875 (1977); *see also Wonsover*, 205 F.3d at 414. It is not enough that the accused aider and abettor's action or omission is "derived from inexcusable neglect." *Sundstrand*, 553 F.2d at 1047. "Extreme recklessness" is neither ordinary negligence nor "merely a heightened form of ordinary negligence."[10] *Steadman*, 967

---

[9] *See, e.g.*, *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F. 3d 338, 344 (4th Cir. 2003); *In re K–tel Intern., Inc. Securities Litigation*, 300 F.3d 881, 893 (8th Cir. 2002); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001); *Platsis v. E.F. Hutton & Co., Inc.*, 946 F.2d 38, 40 (6th Cir. 1991); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir. 1986); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985).

[10] The SEC has called this form of recklessness "a state of mind closer to conscious intent than to gross negligence." Brief for the

F.2d at 641. To put the matter in terms of § 21C, aiding and abetting liability cannot rest on the proposition that the person "should have known" he was assisting violations of the securities laws. *See Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991); *Graham*, 222 F.3d at 1006.

Nothing in the SEC's confusing opinion suggests that it had any of this in mind when it found that Howard acted recklessly. We are willing to assume that the SEC thought – incorrectly – that reckless conduct amounted to a form of awareness of wrongdoing. But we are unwilling to assume that it properly evaluated Howard's conduct under an extreme recklessness standard.[11] Otherwise, there is no explaining why it found Howard liable on most of the aiding and abetting charges against him. The heart of the SEC's case was the violation of Rule 10b–9 through the counting of purchases made in the part-or-none offering that were not "bona fide." The minimum subscription of 2,000,000 shares was improperly reached when someone – not Howard – decided to count the purchases by the Capel Group, JCI, and IDG Development Corporation. What dangers were so obvious that Howard should have known of them? What red flags should have alerted him? The SEC's opinion mentions none regarding the Rule 10b–9 violations. Instead, it finds him reckless for not knowing all the legal requirements of a part-or-none offering and for not disclosing to investors what he did not know – that Rule 10b–9 would be violated when the closing took place.

The SEC adopted Rule 10b–9 in 1962. It is quoted in full in the margin.[12] The rule makes it a "manipulative or

---

SEC as Amicus Curiae, *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), 1992 U.S. Briefs 854 (LEXIS). *See generally Marrie v. SEC*, No. 03–1265, 2004 WL 1585848 (D.C. Cir. July 16, 2004).

[11] In their briefs, Howard and the SEC agreed that the "extreme recklessness" standard of *Steadman*, 967 F.2d at 641–42, applied to aiding and abetting liability.

[12] § 240.10b–9 Prohibited representations in connection with certain offerings.

deception [sic] device or contrivance" to represent that "the security is being offered or sold on any . . . basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distributing being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date." 17 C.F.R. § 240.10b–

---

(a) It shall constitute a manipulative or deception device or contrivance, as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:

(1) To the effect that the security is being offered or sold on an "all-or-none" basis, unless the security is part of an offering or distribution being made on the condition that all or a specified amount of the consideration paid for such security will be promptly refunded to the purchaser unless (i) all of the securities being offered are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date; or (2) To the effect that the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date.

(b) This rule shall not apply to any offer or sale of securities as to which the seller has a firm commitment from underwriters or others (subject only to customary

9(a)(2). The SEC adopted the rule out of concern "that some persons distributing securities have been representing that securities are being offered on an 'all-or-none' basis when, because of ambiguities in the contractual arrangement, it is not clear whether the conditions have been met if the underwriter finds persons who agree to purchase all of the securities within the specified time, but he is unsuccessful in collecting payment for all of the securities." *Proposal to Adopt Rule 10b–9 Under the Securities Exchange Act of 1934*, Exchange Act Release No. 6864, 1962 WL 68100, at \*1 (July 30, 1962).[13]

Neither Rule 10b–9, nor the SEC's contemporaneous explanation of it, mention sales to insiders or persons affiliated with the offeror or whether – as occurred here – these sales may be counted toward the minimum. In a 1975 interpretation of Rule 10b–9, the SEC stated that the rule requires purchases to be "bona fide." *See Requirements of Rules 10b–9 and 15c2–4 Under the Securities Exchange Act of 1934 Relating to Issuers, Underwriters and Broker–Dealers Engaged in an "All or None" Offering*, Exchange Act Release No. 11532, 7 S.E.C. Docket 403, 1975 WL 163128, at \*1 (July 11, 1975). That release, while re-stating the basic purpose of requiring full payment by the specified date, also expressed concern that issuers or underwriters of an offering "have created the misleading appearance of a successful sale of the specified minimum number of securities in order to fulfill the prerequisites to receipt of the proceeds of the offering . . . ." Non-bona fide sales are those which are "designed to create the appearance of a successful completion of the offering, such as purchases by the issuer through nominee accounts or purchases by persons whom the issuer has agreed to guarantee against loss." *Id.*

---

conditions precedent, including "market outs") for the purchase of all the securities being offered.

[13] In an all-or-none offering, all of the securities must be sold within the designated period. In a part-or-none offering, a designated minimum amount must be sold within the specified time. Rule 10b–9 deals with both types of transactions.

Counsel for the SEC argues that the bona fide requirement is simply "common sense," Brief of the SEC at 29, and the SEC's opinion claimed that "[i]t is well established that purchases by underwriters or their affiliates arranged for the undisclosed purpose of closing an unsuccessful part-or-none offering are fraudulent." Comm'n Op., 2003 SEC LEXIS 377, at *12. In support, the SEC directed our attention to a practitioners' guide to Rule 10b–9.[14] Far from supporting the SEC's position that the meaning of Rule 10b–9 should have been apparent to Howard, it states the opposite. The "law applicable to [10b–9] offerings has never been clear, and has been based on a partly unwritten body of interpretation regarding what constitutes a 'bona fide' purchase of securities for purposes of the rules, what advance disclosure may be required regarding purchases by general partners or broker-dealers, and even what constitutes a contingency offering." Robert B. Robbins, *Structuring Best Efforts Offerings and Closings Under Rule 10b–9*, SH067 ALI–ABA 297, 299 (2003) (available on Westlaw). Robbins notes that in this environment of uncertainty, "[f]or many years, the best available guidance took the form of a few SEC staff-prepared seminar outlines, one significant no-action letter and a few published articles. More recently, certain courts have raced ahead to set standards that go well beyond prior interpretations and that create significant new risks for counsel in closing contingency offerings." *Id.* at 304. One of these new interpretations is what Robbins terms the "corroboration" theory. *See id.* at 305–07 (citing *SEC v. Blinder, Robinson & Co.*, 542 F. Supp. 468, 476 (D. Colo. 1982)) ("Each investor is comforted by the knowledge that unless his judgment to take the risk is shared by enough others to sell out the issue, his money will be returned."); *see also, e.g.*, *Svalberg v. SEC*, 876 F.2d 181, 183–84 (D.C. Cir. 1989) (per curiam);[15] *C.E. Carlson, Inc. v.*

---

[14] The SEC also cited other authorities, nearly all of which post-date the transactions at issue here. *See* Brief of the SEC at 29 n.15.

[15] In *Svalberg* we affirmed the National Association of Securities Dealers' finding that petitioners violated Article III, § 1 of the NASD Rules of Fair Practice by purchasing shares in an all-or-none

*SEC*, 859 F.2d 1429, 1434 (10th Cir. 1988). But according to Robbins, "[g]iven the vagueness of the 'corroboration' or 'comfort' standard, it should not be surprising that in recent years it has become increasingly difficult for practitioners to define the circumstances in which Rule[ ] 10b–9 . . . appl[ies]. The difficulties are greatest . . . in the case of purchases, or undertakings to purchase, by affiliates of the issuer." Robbins, *supra*, at 311.

While Howard does not question the SEC's finding that primary violations of Rule 10b–9 occurred through non-bona fide transactions, he does dispute the SEC's claim that there were danger signals or red flags so obvious that he should have noticed them. His point is well-taken. As we understand the SEC's position, the purchases by the Capel Group and JCI were not in themselves illegal. The illegality arose in counting these shares toward the 2,000,000 minimum and closing the offering on that basis without informing the investors that these shares would be counted toward the minimum. Nothing on the face of Rule 10b–9 deals with transactions of this sort. While the SEC's 1975 release spoke of the need for "bona fide" sales, the non-bona fide transactions it mentioned – purchases by the issuer through nominee accounts or purchases by persons whom the issuer guarantees against loss, *see* 1975 WL 163128, at \*1 – do not appear to be of the sort facing us here. And the Robbins article states that there are "many cases in which it is permissible for the sponsor or affiliates to purchase unsold interests in an all-or-none offering," as when the sponsor or affiliates buy "the securities on the same terms as other investors," "take the risk of the investment," and the purchases do not "affect

---

offering they were underwriting. "In this case, petitioners acted to create a false impression that the required minimum number of shares had been sold to the public; therefore, their purchases of SanAnCo with a purpose of closing the underwriting simply cannot be viewed as *bona fide* investments." 876 F.2d at 183. Although *Svalberg* does not specifically address Rule 10b–9, Robbins laments that this decision "raises even greater uncertainties and risks" for securities professionals. Robbins, *supra*, at 309.

the financial condition of the issuer." Robbins, *supra*, at 312 & n.30.[16]

In light of the uncertainties about the meaning of Rule 10b–9,[17] and the SEC's contention that Howard acted recklessly because he should have known that JCI and New Europe Hotels were violating the rule, we asked the SEC at oral argument how a securities professional should go about checking the legality under Rule 10b–9 of counting a given purchase toward the minimum. The SEC attorney agreed that one would normally expect the individual to consult counsel, which brings us to Howard's argument that as "a non-lawyer,[18] [he] cannot be deemed reckless where he relied upon competent and experienced inside and outside counsel." Brief of Petitioner at 26.

The ALJ made the following finding: Howard "believed that Matcovsky, higher management in the Capel Group, and outside counsel had approved actions that violated the anti-fraud provisions and Rule 10b–9." ALJ Dec., 1999 SEC LEXIS 577, at *49. The SEC accepted this finding and the

---

[16] The SEC has given the green light to such purchases, requiring that under Rule 10b–9 the issuer or its affiliates "must disclose the possibility that [it] may make purchases . . . in order to meet the specified minimum." *See Interpretive Release on Regulation D*, Securities Act Release No. 6455, 1983 WL 409415 (Mar. 3, 1983) (Question 79); *see* Peter M. Fass & Derek A. Wittner, Blue Sky Practice for Public and Private Direct Participation Offerings § 7:54 (2003–04 ed.). In its opinion here the SEC noted that only "undisclosed" purchases by underwriters or their affiliates in a part-or none offering are fraudulent. Comm'n Op., 2003 SEC LEXIS 377, at *12. This suggests that if JCI had disclosed to investors not only the Capel Group's purchase but also that these shares would be counted toward the minimum, the transaction would not have violated Rule 10b–9.

[17] We do not suggest that the SEC erred in concluding that JCI and New Europe Hotels violated Rule 10b–9.

[18] Howard attended law school in England and worked for a London law firm prior to coming to the United States. He did not study or practice law in the United States.

record plainly supports it. For instance, when the board of directors of New Europe Hotels approved the transaction involving IDG Development Corporation, Howard – a member of the board – was on vacation. Matcovsky, who headed JCI's corporate finance department and had been a lawyer with the SEC's Division of Market Regulation, called Howard to inform him of the news and to solicit his vote. Matcovsky was also a member of New Europe's board, as was the Dean of the New York University Graduate School of Business. Only after Matcovsky reported that the board had voted in favor of the transaction and that Rogers & Wells had approved it did Howard add his approval. (The partner in charge at Rogers & Wells specialized in securities law and had more than 20 years of experience.) Howard remained on vacation when the closing took place at the offices of Rogers & Wells. And it was at the closing that the purchases by the Capel Group, JCI, and IDG Development Corporation were counted toward the minimum in violation of Rule 10b–9. In the fall of the next year, Rogers & Wells prepared the second offering documents, documents the SEC determined should have disclosed that the first offering closed improperly. As with the first offering, Howard played no role in drafting those documents, again relying on the expertise of outside counsel and JCI's corporate finance department. The SEC dismissed this and other such evidence on the ground that "Howard had an ongoing obligation to familiarize himself with pertinent legal requirements in order to protect investors from illegality." Comm'n Op., 2003 SEC LEXIS 377, at *15. This entirely misses the significance of the evidence. Extreme recklessness, as we have discussed, means that the alleged aider and abettor – although not knowing that he was assisting wrongdoing – should have been alerted by "red flags" signifying obvious problems. In this case, rather than red flags, Howard encountered green ones, as outside and inside counsel approved transactions and counted sales that, the SEC later determined, should not have been counted under a rule whose language was silent on the subject.

In its brief, the SEC offers two other rationales for disregarding this evidence: one, Howard, never claimed the *de-*

*fense* of reliance of counsel; and two, even if he had, he failed to qualify for the defense because he did not make full disclosure to counsel, did not request counsel's advice, did not receive advice, and did not rely in good faith on that advice. The SEC's opinion relied on neither rationale, *see United States v. Chenery Corp.*, 332 U.S. 194, 200 (1947), and it would have been error for it to do so.

Despite dicta in *SEC v. Savoy*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981), reliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter. *See Bisno v. United States*, 299 F.2d 711, 719 (9th Cir. 1961). As a former SEC commissioner put it, the "reliance defense . . . is not really a defense at all but simply some evidence tending to support a defense based on due care or good faith." Bevis Longstreth, *Reliance on Advice of Counsel as a Defense to Securities Law Violations*, 37 Bus. Law. 1185, 1187 (1982).[19] The SEC itself recognized as much in *In re Charles C. Carlson*, 46 S.E.C. 1125, 1132–33 (1977), when it held that a broker reasonably relied on a lawyer's advice (which turned out to be mistaken) and added that although such a securities professional should have been familiar with the "rudiments" of securities law, he should not be "expected to display finished scholarship in all of the fine points."[20]

---

[19] *See also* Douglas W. Hawes & Thomas J. Sherrard, *Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases*, 62 Va. L. Rev. 1, 7–8 (1976) ("[R]eliance is recognized only as a factor or circumstance tending to show the defendant's good faith or exercise of due care; it is not in itself a complete and absolute defense."); Gregory E. Maggs, *Consumer Bankruptcy Fraud and the "Reliance on Advice of Counsel" Argument*, 69 Am. Bankr. L.J. 1, 10 (1995) ("[R]eliance on the advice of counsel is not an affirmative defense. Instead, when a defendant introduces evidence of reliance on counsel, the defendant is usually trying to negate an element of a particular crime or tort, such as fraudulent intent.").

[20] An essential means by which securities professionals comply with the law is through the guidance of counsel. *See* Hawes & Sherrard, *supra* note 19, at 36 (securities laws are "complex and often uncertain"; "the layman [*i.e.*, a non-lawyer] has no real choice

The facts that Rogers & Wells oversaw the closing of the first offering at its law offices, that it drafted the documents for the second offering and that Matcovsky conveyed to Howard his and the law firm's approval of the Capel Group's purchases and the IDG Development Corporation transaction constituted powerful evidence that Howard's actions did not amount to "an extreme departure from the standards of ordinary care" "so obvious that the actor must have been aware of it." *Steadman*, 967 F.2d at 641–42, quoting *Sundstrand*, 553 F.2d at 1045.[21] The SEC's response, found in its

but to rely on counsel."). Legal counsel plays a critical role in the functioning of securities transactions. "Significant public benefits flow from the effective performance of the securities lawyer's role. The exercise of independent, careful and informed legal judgment on difficult issues is critical to the flow of material information to the securities markets." *In re William R. Carter, Charles J. Johnson Jr.*, 47 S.E.C. 471, 504 (1981); *see also SEC v. Spectrum, Ltd.*, 489 F.2d 535, 541–42 (2d Cir. 1973) ("The legal profession plays a unique and pivotal role in the effective implementation of the securities laws. Questions of compliance with the intricate provisions of these statutes are ever present and the smooth functioning of the securities markets will be seriously disturbed if the public cannot rely on the expertise proferred by an attorney when he renders an opinion on such matters.").

[21] *Steadman* held that the directors of a mutual fund had not acted recklessly in relying on advice from outside counsel that turned out to be wrong. 967 F.2d at 642. This court's opinion in *Investors Research*, 628 F.2d at 178 n.65, also indicated that an accused's belief that the law permitted the transactions is evidence of a lack of scienter.

Some states protect directors from liability when they reasonably rely on counsel or other experts. *See, e.g.*, N.Y. BUS. CORP. LAW § 717 (McKinney 2004) ("director shall be entitled to rely on information, opinions, reports or statements . . . prepared or presented by . . . counsel, public accountants or other persons as to matters which the director believes to be within such person's professional or expert competence"); DEL. CODE ANN. tit. 8, § 141(e) (2003) (similar language); MODEL BUS. CORP. ACT § 8.30(e)(2) (2002); *see also Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 904

brief but not its opinion, is that the evidence does not bear on Howard's conduct because Matcovsky, not Howard, served as the liaison to Rogers & Wells. That cannot be correct. Suppose a company president communicates directly with competent outside counsel; makes full disclosure; is advised – incorrectly – that the proposed transaction is entirely lawful; tells junior officers in the company of the legal advice; and instructs them to consummate the transaction. Under the SEC's theory, the president could avoid charges of fraudulent conduct by using the attorney's advice to prove his lack of scienter while those working under him could not. That is illogical and makes no sense whatsoever. If the SEC were right, all corporate employees below the top echelon would have to consult outside counsel directly in order to receive the same legal advice given top management. That not only would run up the legal bills, but it would be impractical and highly inefficient.[22] At any rate, the SEC's argument is at best only a partial answer to Howard's claim because he also relied on inside counsel – Matcovsky, with whom he communicated directly.

In *Graham*, what made the defendant's actions reckless, and not merely negligent, was an "abundance" of "red flags and suggestions of irregularities [that] demand[ed] inquiry as well as adequate follow-up and review." 222 F.3d at 1006 (internal quotations and citation omitted); *see also Wonsover*, 205 F.3d at 411 (noting existence of "several 'red flags' "). On this record, the SEC is unable to identify any such unusual circumstances with regard to the non-bona fide purchases – the focus of the SEC's attention in this case. All the SEC can say is that Howard should have known what the

(W.D.N.Y. 1983); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. 1994).

[22] *Compare Levine v. SEC*, 436 F.2d 88, 90 (2d Cir. 1971): "[A]bsent actual knowledge or warning signals, a broker-dealer should not be under a duty to retain his own auditor to re-examine the books of every company, the stock of which he may offer for sale, even accepting the doubtful hypothesis that such permission would be granted."

legal requirements of Rule 10b–9 were and that he violated the disclosure laws by failing to reveal what he should have found out, but did not. At best this amounts to a finding of negligence; at worst it is liability without fault. Given the record in this case, there is no substantial evidence that Howard had the requisite scienter to aid and abet the violations, caused by JCI's counting of non-bona fide purchases towards the minimum of the part-or-none offering, of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rules 10b–5 and 10b–9 thereunder.

We are left with two loose ends for the SEC to address on remand. The first deals with the *apparent* fact that in the first offering – in the words of Rule 10b–9(a)(2)(ii) – "the total amount due to the seller [was not] received by him by a specified date."[23] 17 C.F.R. § 240.10b–9(a)(2)(ii). Howard agrees that a third of the shares had not been paid for by the closing date of January 2, 1991, while he was on vacation. He learned of the problems when he returned to work two days later. "Settlements were not his responsibility, but to assist . . . important customers Howard tried to help solve the problems. . . ." ALJ Dec., 1999 SEC LEXIS 577, at *27.[24] The SEC determined that Howard aided and abetted the primary violation of Rule 10b–9(a)(2)(ii) because he "played a substantial role in collecting late subscription payments from

---

[23] We say "apparent" in light of this factual conclusion of the ALJ, which seems to contradict not only the SEC's legal conclusion but also the ALJ's:

> A second condition [of a part-or-none offering] is that the total amount due the seller is received by him by a specified date. Rule 10b–9(a)(2)(B). The Division does not contend that this aspect of Rule 10b–9 was violated, and there is insufficient evidence in the record to make a finding as to the date [New Europe Hotels] received the funds raised in the first offering.

ALJ Dec., 1999 SEC LEXIS 577, at *34 n.17. The SEC's brief devotes hardly any attention to the matter.

[24] The problems arose when subscribers received conflicting advice about where they should send their payments.

those whose failure to make timely payment should have aborted the offering." Comm'n Op., 2003 SEC LEXIS 377, at *20. (It is not clear whether Howard relied on the advice of counsel in taking on this role.) So far as we can tell, the SEC made no finding that Howard was aware of wrongdoing or that he acted recklessly with respect to the late payments. Neither the SEC nor Howard has much to say on the general subject of the late payments. Given the confusing state of the record, *see supra* note 23, the SEC's failure to make an essential finding and its erroneous treatment of recklessness as a mere "should have known" standard, we must send this charge back to the SEC for reconsideration.

The second matter we are remanding deals with Howard's aiding and abetting a violation of the Investment Company Act. Section 17(a), in conjunction with § 2(a)(3)(E), prohibited JCI from selling securities to the European Warrant Fund, an investment company it was advising, after the closing. 15 U.S.C. §§ 80a–17(a)(1), 80a–2(a)(3)(E). *See supra* note 3. As the SEC acknowledged, Howard did not know the transaction was unlawful. We have discovered no evidence to indicate that he received legal advice from either Matcovsky directly or Rogers & Wells indirectly. He claimed he relied on JCI's president, and on JCI's compliance department. While the SEC did not find that Howard had knowledge of wrongdoing, it did find that he acted recklessly in assisting in this transaction. His recklessness, according to the SEC, was in not being aware of the requirements of § 17(a)(1). As we have discussed, the SEC's version of recklessness with respect to the Rule 10b charges was erroneous. Nothing persuades us that it applied a different version to this charge. But unlike the Rule 10b violations, we cannot determine whether the evidence of Howard's aiding and abetting the violation of § 17(a)(1) would be insufficient if the SEC evaluated it in light of the correct standard of recklessness.

\* \* \*

The SEC's order imposing sanctions against Howard is vacated and the case is remanded for reconsideration only

with respect to the charges that he aided and abetted the violations of Rule 10b–9(a)(2)(ii) and § 17(a)(1) of the Investment Company Act.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

I agree with my colleagues that the SEC's order cannot stand because Howard did not act, or fail to act, with the requisite scienter of an aider and abettor. I do not agree with the majority's formulation of the requisite scienter, however, and I therefore concur in the judgment.

In the usual aiding and abetting scenario, we ask three questions: whether "1) another party has committed a securities law violation; 2) the accused aider and abetter had a general awareness that his role was part of an overall activity that was improper; and 3) the accused aider and abetter knowingly and substantially assisted the principal violation." *Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir. 1980); *see also Dirks v. SEC*, 681 F.2d 824, 844 (D.C. Cir. 1982), *rev'd on other grounds*, 463 U.S. 646 (1983). As the majority opinion notes, Maj. Op. at 9–10, here the SEC found that Howard's *un*awareness that his role was part of improper activity fulfilled the second *Investors Research* element. I believe the SEC's finding in this respect is not supported by substantial evidence, *see* 15 U.S.C. § 78y(a)(4), because Howard was not "recklessly" ignorant and therefore, under our precedent, including *Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000), *inter alia*, we must vacate the SEC's order. Where I part company with the majority is in its apparent use of two distinct lines of authority regarding recklessness – one applying to a securities violation, whether committed by a primary actor or by an aider and abettor, the other applying to the second *Investors Research* element of "general awareness of wrongdoing" – to announce a new, and I believe, incorrect, scienter level to satisfy the latter.

We have held in the securities area that willfulness can support a primary violation, *Wonsover v. SEC*, 205 F.3d 408, 416 (D.C. Cir. 2000) (concluding that "substantial evidence supports the [SEC]'s determination that Wonsover failed to conduct reasonable inquiry into the sources of the unregistered shares he sold and that his inadequate inquiry in the face of several 'red flags' justified a finding of *willfulness*" (emphasis added)), as can "extreme" recklessness. *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992). In *Steadman*,

we considered both primary violations of section 10(b) of the Securities Exchange Act and Rule 10b–5, *inter alia*, allegedly committed by Steadman and others, and Steadman's separate liability as an aider and abettor in the defendant corporation's violations of certain SEC regulations. Relying on *Investors Research*, we stated that an aider and abettor must " 'knowingly and substantially assist[ ]' in the commission of a securities violation, with at least 'a general awareness that his role was part of an overall activity that was improper.' " *Steadman*, 967 F.2d at 647 (quoting *Investors Research*, 628 F.2d at 178 (alteration in original)).[1]

More recently, in *Graham v. SEC*, *supra*, the court articulated the test for aiding and abetting liability as follows:

> Although variously formulated, three principal elements are required to establish liability for aiding and abetting a violation of section 10(b) and Rule 10b–5: (1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary "scienter"—i.e., that she rendered such assistance knowingly or recklessly. *See SEC v. Fehn*, 97 F.3d 1276, 1287–88 (9th Cir. 1996); *Bloor v. Carro, Span-*

---

[1] Earlier in *Steadman*, we observed that "we have determined, along with a number of other circuits, that *extreme* recklessness may also satisfy this [*Hochfelder*] intent requirement." 967 F.2d at 641 (emphasis added). The D.C. circuit precedent it then cited, however, never spoke of "extreme" recklessness. On the contrary, it stated repeatedly that "recklessness satisfies the 10b–5 scienter requirement." *Dirks v. SEC*, 681 F.2d at 844; *see also id.* at 845 n.28. Perhaps the *Steadman* court equated the Seventh Circuit's "*extreme* departure from the standards of ordinary care" language with *extreme* recklessness. *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (internal quotation marks omitted and emphasis added). In any event, to the extent (if any) it intended to impose a higher degree of recklessness, it did not do so with respect to the "general awareness of wrongdoing" element of Steadman's aiding and abetting liability. That discussion, as noted above, adopted the *Investors Research* test.

*bock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985); *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 72 (D.C. Cir. 1980); *Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir. 1980); *see also SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992).

222 F.3d at 1000. *Graham*'s third element "that [the aider and abettor] rendered such assistance knowingly or recklessly" can only be a reformulation of the *Investors Research* "general awareness of wrongdoing" element, both because *Graham* expressly relies on *Investors Research* in its articulation and because the other two parts of the *Investors Research* test are covered in *Graham*'s first and second elements. *Graham* later focuses on the "third element" of aiding and abetting liability:

> The real question here concerns the third element of aiding and abetting liability: did Graham assist Broumas with the requisite scienter? We have held that knowledge or recklessness is sufficient to satisfy that requirement. *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992); *Zoelsch* [*v. Arthur Anderson & Co.*], 824 F.2d [27,] 36 [(D.C. Cir. 1987)]; *Dirks v. SEC*, 681 F.2d 824, 844–45 (D.C. Cir. 1982), *rev'd on other grounds*, 463 U.S. 646 (1983). . . . We are satisfied that Graham acted with at least extreme recklessness in aiding Broumas' stock-kiting scheme.

222 F.3d at 1004. *Graham*'s use of "extreme" recklessness here and elsewhere, *see id.* at 1006 ("Given the abundance of red flags here, it would be very hard to characterize Graham's conduct as anything but extremely reckless, regardless of the approvals she received. . . ."), describes the *extent* of Graham's recklessness; it does not impose a *requirement* of extreme recklessness to support the "third element" (*Investors Research*'s second element) of aiding and abetting liability. This reading is plain, most notably from *Graham*'s own

recognition that "recklessness is sufficient" as well as its express reliance on *Dirks*.  *See supra* n.1.

The majority opinion, however, misreads both *Steadman* and *Graham* to "*hold* that 'extreme recklessness' may support [the second *Investors Research* element of] aiding and aiding liability."  Maj. Op. at 10 (emphasis added).  That "may" means "must" in the majority's view – and that the majority is in fact addressing the second *Investors Research* element – is apparent from its subsequent discussion, particularly the following passage: "We are willing to assume that the SEC thought – incorrectly – that reckless conduct amounted to a form of awareness of wrongdoing.  But we are unwilling to assume that it properly evaluated Howard's under an extreme recklessness standard."  Maj. Op. at 11.  It ultimately concludes that the SEC improperly evaluated Howard's conduct because it used "recklessness" rather than "extreme recklessness" as the requisite level of scienter.  Maj. Op. at 16–17.  I believe its application of an "extreme" recklessness standard is wrong.

While I characterized the majority's error as using two "distinct" lines of authority regarding recklessness, *supra* at 1, one line is, at least to me, not altogether clear.  Although we said in *Steadman* that "extreme" recklessness satisfies the intent requirement, we relied on Circuit precedent that held that recklessness suffices.  *Supra* n.1.[2]  Is there a difference?  The majority plainly thinks so.  Whether the two terms in fact impose different standards in satisfying the "[*Hochfelder*] intent requirement," *Steadman*, 967 F.2d at 641, or are merely descriptive of the degree of recklessness exhibited,[3] we need not decide in this case because the *separate* stan-

---

[2] *See also Kowal*, 16 F.3d at 1276 ("To state a claim for securities fraud under Rule 10b–5, a plaintiff must allege that the defendant knowingly or recklessly made a false or misleading statement of material fact in connection with the purchase or sale of a security, upon which plaintiff reasonably relied, proximately causing his injury.")

[3] *See generally Marrie v. SEC*, No. 03–1265 (D.C. Cir. July 16, 2004).

dard – applicable to an element of aiding and abetting, but not primary, liability – for determining whether Howard's lack of awareness of the primary violations of Rule 10b–9 is sanctionable is recklessness. *This* line of authority is distinct *and* clear. *Graham*, 222 F.3d at 1000, 1004; *Dirks*, 681 F.2d at 844; *Steadman*, 967 F.2d at 647; *Investors Research,* 628 F.2d at 178; *see also Zoelsch*, 824 F.2d at 36. The SEC, relying on *Graham*, J.A. 517, 522 n.17, *correctly* applied the recklessness standard to Howard's unawareness of the improper activity; its error lies in its conclusion that Howard's ignorance was in fact reckless. For the foregoing reasons, I concur in the vacatur of the SEC's order as well as the partial remand.