# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued November 23, 2004          Decided February 8, 2005

No. 04-1047

JAMES THOMAS MCCURDY,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

―――――

On Petition for Review of an Order of the
Securities and Exchange Commission

―――――

*Charles M. Carberry* argued the cause and filed the briefs for petitioner.

*Michael A. Conley*, Senior Special Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Giovanni P. Prezioso*, General Counsel, and *Eric Summergrad*, Deputy Solicitor. *Mark R. Pennington*, Assistant General Counsel, entered an appearance.

Before: EDWARDS, SENTELLE, and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: The Securities and Exchange Commission suspended James T. McCurdy for one year after finding that he recklessly departed from generally accepted auditing standards ("GAAS") in his audit of a mutual fund's 1998 financial statements. The case centered on the treatment of a single receivable on the balance sheet of JWB Aggressive Growth Fund, a diversified, open-end management investment company. McCurdy's arguments are that the Commission improperly applied GAAS, that its finding of recklessness was not supported by substantial evidence, and that it exceeded its authority in imposing a one year suspension.

## I.

John W. Bagwell founded JWB Aggressive Growth Fund and registered it with the Commission in 1995. Bagwell served as the fund's chief executive officer and was a member of its board of trustees. JWB Investment Advisory & Research, Inc., Bagwell's sole proprietorship, was the investment advisor of the fund, its only client. (We will refer to JWB Investment, in its capacity as the fund's advisor, as Bagwell.) At its height, the fund had 60 investors and assets of $456,000. The fund is now defunct.

When the fund began operations in 1996, Bagwell voluntarily agreed to waive any management fees and to reimburse the fund for its expenses exceeding 2.35% of the fund's assets. In the years that followed, the fund paid the expenses when incurred and Bagwell reimbursed it at the end of the year for the amount reported in the fund's "Due From Advisor" account. The arrangement was terminable at will, with advance notice to the board of trustees. Until the year ending December 31, 1998, Bagwell covered all such expenses. At the end of 1997, the unpaid balance in the "Due From Advisor" account was $3,783. During 1998, the fund's expenses grew to

approximately $100,000. By year end, the "Due From Advisor" account had an outstanding balance of about $80,000, after an approximately $20,000 offset for organizational expenses due to Bagwell.

On November 20, 1998, Bagwell sent a letter to the board, outlining a proposed repayment plan, with monthly payments of at least $5,000 a month, beginning that month and continuing until the receivable was repaid. At a meeting of the five-member board on December 3, 1998, Bagwell gave notice of his intention to withdraw from the reimbursement agreement. By this time, Bagwell had already missed his proposed first payment. He informed the board that it would be "extremely difficult" for him to pay off the receivable by year's end. The four other board members reviewed Bagwell's income statement and balance sheet, which he had provided at the meeting. Satisfied of his ability to pay, they agreed to allow him until June 1999 to repay the $80,000 balance on the payment terms he had proposed.

At the same meeting, the board followed Bagwell's recommendation and retained a new auditor, McCurdy & Associates CPAs, Inc., an accounting firm specializing in mutual funds. The firm's founder, James Thomas McCurdy, had been a certified public accountant licensed to practice in Ohio since 1980. In light of the fund's ongoing cost-cutting efforts, McCurdy pledged in his engagement letter to keep fees and expenses to a minimum in his audit of the year ending December 31, 1998.

McCurdy completed his field work on the audit in January 1999, and submitted a report dated January 25. By that time, Bagwell had missed his first two payments under the board-approved schedule and was at least $10,000 in arrears.

McCurdy's report accompanied the fund's filings with the Commission on March 8, 1999.

The fund's audited financial statements showed $340,484 in assets, of which $83,399 represented the "Due From Advisor" receivable. In light of the fact that twenty-five percent of the fund's assets depended on the collectibility of this related-party account, McCurdy recognized that the receivable was material and would require special scrutiny. In analyzing the probability of collecting the receivable, he relied on the board's decision to allow Bagwell time to repay his obligation. He read the minutes of the meeting. He also spoke to the fund's attorney, who was present at the meeting. But he did not speak with any board member or with Bagwell (except to confirm that the receivable existed), and he neither examined nor tested the financial data Bagwell presented to the board. McCurdy also relied on the February 1999 renewal of the fund's bond by Gulf Insurance Company, although he took no steps to ascertain the basis for the company's decision. And he considered Bagwell's history of making timely payments in previous years, as well as the fact that the receivable could no longer continue to grow because the reimbursement arrangement had terminated. On the basis of this information, McCurdy concluded that the receivable was probably collectible and that it properly could be treated as an asset under generally accepted accounting principles.

The Commission charged McCurdy with improper professional conduct in violation of Rule 102(e) of the Commission's Rules of Practice, citing his failure to obtain sufficient competent evidence to support his conclusion regarding the receivable, his failure to render an accurate report, and his lack of professional skepticism and due professional care. After an evidentiary hearing, an administrative law judge concluded that while McCurdy's audit of the receivable did not comport with GAAS, his conduct did not constitute reckless or

highly unreasonable behavior. The Commission disagreed, finding McCurdy's audit both reckless and highly unreasonable. It therefore suspended McCurdy from practicing before the Commission for one year.

## II.

Information is the lifeblood of the market. For the market to operate efficiently -- indeed, for it to operate at all -- information must have some measure of reliability. Investor confidence is bolstered by the knowledge that public financial statements have been subjected to the rigors of independent and objective investigation and analysis. *See, e.g.*, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS ("AICPA"), CODE OF PROFESSIONAL CONDUCT § 53, *available at* http://www.aicpa.org; VINCENT M. O'REILLY ET AL., MONTGOMERY'S AUDITING 13-14 (11th ed. 1990). Independent auditors therefore must exercise reasonable diligence in reviewing financial statements. *See* AICPA, CODIFICATION OF STATEMENTS ON AUDITING STANDARDS ("AU") § 230.01 (1998). Because it is not possible to give each transaction the fullest scrutiny, professional auditing standards have come to recognize, through decades of experience, particular factors that arouse suspicion and call for focused investigation. These factors are the so-called "red flags" for which all auditors are trained to remain alert. *See Howard v. SEC*, 376 F.3d 1136, 1149 (D.C. Cir. 2004) (citing *Graham v. SEC*, 222 F.3d 994, 1006 (D.C. Cir. 2000), and *Wonsover v. SEC*, 205 F.3d 408, 411 (D.C. Cir. 2000)).

Among transactions calling for close inspection are related-party transactions, including transactions between a company and its officers or directors. Such dealings are viewed with extreme skepticism in all areas of finance. *See, e.g.*, 17 C.F.R. § 210.4-08(k)(1) (one of many disclosures of related-party

transactions required by the Commission in the securities context); *Gordon v. Comm'r*, 85 T.C. 309, 326-27 (1985) (explaining "heightened" skepticism of the form related-party transactions).  The reason for this is apparent:  Although in an ordinary arms-length transaction, one may assume that parties will act in their own economic self-interest, this assumption breaks down when the parties are related.  A company that would perform a thorough credit-risk assessment before extending a loan might not do so if the loan were to one of its officers or directors.  Accordingly, GAAS explicitly recognize the need for particular care in the auditor's examination of material related-party transactions.  AICPA, AU § 334.

In response to the inherently suspicious nature of such transactions, the AICPA has identified particular sources of information to which an auditor should turn for assurance regarding material outstanding balances associated with related-party transactions: "audited financial statements, unaudited financial statements, income tax returns, and reports issued by regulatory agencies, taxing authorities, financial publications, or credit agencies."  AICPA, AU § 334.10(e).  McCurdy took no steps to obtain or consult any of these sources with regard to this receivable.  The question then is whether, in view of the information upon which he did rely, the Commission was warranted in finding that he lacked sufficient information to form a reasoned judgment about the receivable's collectibility.

A.

A basic guideline of field work requires auditors to form their opinions on the basis of "[s]ufficient competent evidential matter," "obtained through inspection, observation, inquiries, and confirmations."  AICPA, AU § 326.01.  In considering the evidence upon which McCurdy relied, the Commission properly disregarded what was not competent.  The Commission found,

for instance, that Gulf Insurance Company's renewal of the fund's bond in February 1999 could not support a reasonable judgment that the receivable was collectible. The bond covered "Uncollectible Items," with a limit of liability of $25,000. The record does not establish whether, at the time, Gulf was aware of the status of the receivable. The Commission believed that Gulf had only the fund's 1997 financial statements, apparently because the 1998 financial statements listing the receivable were not filed with the Commission until March. *In re McCurdy*, Exchange Act Release No. 34-49182, 2004 WL 210606 ("Comm'n Op."), at *4, *6 (Feb. 4, 2004). In any case, McCurdy could not have known whether Gulf investigated the receivable in deciding to renew the bond. He did not contact Gulf or otherwise attempt to ascertain the reason for Gulf's decision; his inference of support for the collectibility of the receivable amounted to pure speculation.

The Commission also properly rejected McCurdy's reliance on the size of the receivable. McCurdy viewed $83,399 as not "inherently large." *Id.* at *7. As compared to what? Bagwell must have thought it a large sum; at the board meeting, he told the trustees that it would be "extremely difficult" for him to come up with that amount of money by the end of 1998. What matters under GAAS is that the receivable comprised a quarter of the fund's assets, which made it important for an independent auditor to examine carefully whether Bagwell could and would repay the balance on time. For similar reasons, the Commission refused to give any credit to McCurdy's assertion that the receivable was probably collectible because it would not get any larger in 1999. *Id.* Like the Commission, we cannot see how this makes it more likely that the fund would collect the balance remaining at the end of 1998.

After discounting this evidence, two sources of support for McCurdy's conclusion remain: Bagwell's history of payment

in prior years, and the decision of the board of trustees to extend Bagwell's repayment period. Bagwell's previous payments are only minimally instructive, in light of the fact that the 1998 receivable dwarfed the prior balances. In addition, as the Commission stated, "[w]hile a history of default would have been a source of concern, the lack of such a history does not establish probable collectibility on these facts." *Id*. That leaves the decision of the board, to which McCurdy gave "substantial" weight in forming his opinion. *Id*. at *5. The most glaring problem with McCurdy's reliance on this fact is that he considered only the vague and narrow snapshot offered by the official minutes of the December 3 meeting, which consisted of the following two sentences:

> The Board then questioned Mr. Bagwell at length concerning the financial condition of the Adviser, the Adviser's ability to pay off the account in a reasonable time period, and the sources of income available to the Adviser to pay off such sums. The Adviser presented a balance sheet and income statement to the Board and demonstrated, to the satisfaction of the Board, that the Adviser would be able to pay off the account not later than June of 1999.

Neither the reliability of Bagwell's balance sheet nor his financial condition at the time can be gleaned from these statements. Collection of the debt depended on both. Yet McCurdy took no steps to investigate. The Commission determined, with ample support in the record, that the evidence McCurdy had before him at the conclusion of his audit was insufficient to support his conclusion that the receivable was probably collectible. 15 U.S.C. § 78y(a)(4); *Steadman v. SEC*, 450 U.S. 91, 97 n.12 (1981).

B.

McCurdy maintains that his actions fell within the bounds of auditor judgment as contemplated by GAAS. He points to AU § 326.22, which states that the "amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment after a careful study of the circumstances in the particular case." Speaking of judicial discretion, Chief Justice Marshall observed that such choices are not left to a court's "inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F. Cas. 30, 35 (C.C. Va. 1807). To paraphrase, an auditor must exercise, not his "inclination," but his "professional judgment" and that judgment must be "guided by sound" auditing principles, among which are a "thorough . . . search for evidential matter," AU § 326.23, and an "attitude that includes a questioning mind and a critical assessment of audit evidence," AU § 230.07. The Commission's conclusion that McCurdy was derelict in performing these and other auditing functions is amply supported.

McCurdy's departures from GAAS fell into two basic categories. He formed an opinion on the basis of insufficient evidence, and he failed to obtain additional evidence that might properly have supported an opinion. In reaching its finding of recklessness, the Commission focused on errors of the latter type. Under SEC Rule 102(e), recklessness is "not merely a heightened form of ordinary care," but rather an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the [actor] or is so obvious that the actor must have been aware of it." 63 Fed. Reg. 57,164, 57,167 (Oct. 26, 1988) (quoting *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992)). McCurdy contends that the Commission ignored this scienter

requirement. The record is otherwise. The Commission properly applied the standard, noting at the outset of its recklessness analysis that McCurdy "knew that the Receivable was 'very material' to the Fund; he also recognized that it represented a related party transaction." Comm'n Op. at *8. The Commission so stated in order to highlight the danger signals apparent to McCurdy. He knew that the receivable presented a significant risk of misleading the public if it were reported as an asset and yet not probably collectible. His actions in response fell short of GAAS requirements, but did they constitute an extreme departure?

The Commission's finding of recklessness rested on a combination of the suspicious nature of the receivable, and the stunning lack of skepticism and investigatory initiative McCurdy displayed. Upon entering into his engagement with the fund, McCurdy was confronted by a surfeit of red flags surrounding the receivable. The receivable was nearly ten times the amount of the GAAS-dictated materiality threshold, which McCurdy calculated at the outset of the engagement. The related-party interest underlying the transaction was not minor: Bagwell was the founder and CEO of the fund, a trustee, and its investment advisor. As if this were not enough, the arrangement that gave rise to the receivable also was described by the board's counsel as, "under normal circumstances, . . . illegal." Comm'n Op. at *2. Not only a professional auditor charged with a duty of skepticism, but any rational observer, should have been highly suspicious in the face of these facts. *See* AICPA, AU § 230.07.

In short, investigating and classifying this receivable was McCurdy's single most important task in performing his audit. Yet his actions in response to this duty were perfunctory at best. As this court recently held, "an extreme departure occurs, for instance, when an auditor 'skips procedures designed to test a

company's reports or looks the other way despite suspicions.'" *Marrie v. SEC*, 374 F.3d 1196, 1206 (D.C. Cir. 2004) (quoting *In re Marrie*, 2003 WL 21741785, at \*11-\*12 (July 29, 2003)). In defense of his complete failure to seek firsthand corroboration of Bagwell's financial situation, McCurdy asserts that GAAS in fact prefer independent evidence to records in the control of the audited company. We do not understand the point. The fund -- not Bagwell -- was McCurdy's client, and the subject of the audit. The records in question related to Bagwell in his capacity as the fund's advisor, and those records were under Bagwell's control, not the fund's. McCurdy's rationale also does not explain his failure to contact the other trustees, whom McCurdy repeatedly describes as "independent" in justifying the weight he gave their decision. *See* Brief for Petitioner at 34-38. As the Commission noted, GAAS required these inquiries. Had McCurdy made them, it would have added little additional cost to the audit, but would have offered the possibility of significant additional insight -- such as, for example, the fact that, by the time McCurdy completed his audit report, Bagwell had not made any of his agreed-upon payments. McCurdy's failure to take these simple steps amply supports the Commission's finding of recklessness. We therefore need not reach the Commission's alternate finding of highly unreasonable conduct.

## C.

The Commission may impose sanctions for a remedial purpose, but not for punishment. *See* SEC Rule 102(e)(1)(iv); *Johnson v. SEC*, 87 F.3d 484, 490 (D.C. Cir. 1996). McCurdy contends that because the Commission based its suspension solely on his past conduct, the order was *ultra vires* and should be set aside. It is difficult to imagine how *any* suspension, remedial or not, could be based on anything but past actions. At all events, the Commission here began its order by stating that "it is in the public interest for [McCurdy] to be denied the

privilege of appearing or practicing before the Commission," Comm'n Op. at *1, and later specifically noted that "McCurdy has significant experience in audit work," which "makes his failure to conduct the audit in accordance with applicable professional standards particularly troublesome," *id.* at *9. It is troublesome, the Commission continued, because the Commission "anticipate[d] that he will continue to conduct audits of public companies." *Id.* The purpose of the sanction thus was not to punish McCurdy, but rather to protect the public from his demonstrated capacity for recklessness in the present, and presumably to encourage his more rigorous compliance with GAAS in the future. The Commission acted within the bounds of its authority in issuing this order.

Accordingly, the petition for review is denied.

*So ordered.*