# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 16, 2017   Decided October 13, 2017

No. 15-1430

JOHN M.E. SAAD,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of
the Securities & Exchange Commission

*Sara E. Kropf* argued the cause for petitioner. With her on the briefs was *Steven Nathan Berk*.

*Dina B. Mishra*, Attorney, U.S. Securities and Exchange Commission, argued the cause for respondent. On the brief were *Anne K. Small*, General Counsel at the time the brief was filed, *Sanket J. Bulsara*, Deputy General Counsel at the time the brief was filed, *John W. Avery*, Deputy Solicitor, and *Christopher Paik*, Special Counsel.

Before: GARLAND, *Chief Judge*, and KAVANAUGH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

*Concurring* opinion filed by *Circuit Judge* Kavanaugh.

*Dubitante* opinion filed by *Circuit Judge* Millett with respect to Section II.B of the opinion.

MILLETT, *Circuit Judge*:  John M.E. Saad, a broker-dealer, unlawfully misappropriated his employer's funds on two separate occasions, and then spent the next seven months misleading investigators in an effort to cover up his wrongdoing.  After a lengthy review process, the Securities and Exchange Commission sustained a decision of the Financial Industry Regulatory Authority ("FINRA") permanently barring Saad from membership and from working with any of its affiliated members.  Saad challenges the Commission's decision as insufficiently attentive to mitigating factors and argues that the permanent bar is impermissibly punitive rather than remedial.  We hold that the Commission reasonably grounded its decision in the record, which extensively evidenced Saad's acts of misappropriation, his prolonged efforts to cover his tracks through falsehoods, and his repeated and deliberate obstruction of investigators.  With respect to the permanent bar on Saad's registration with FINRA and affiliation with its members, the court remands for the Commission to determine in the first instance whether *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), has any bearing on Saad's case.  Accordingly, Saad's petition for review is denied in part and remanded to the Commission in part.

3

**I**

**A**

FINRA is a private self-regulatory organization that oversees the securities industry, including broker-dealers. *Saad v. SEC*, 718 F.3d 904, 907 (D.C. Cir. 2013); *see Public Investors Arbitration Bar Ass'n v. SEC*, 771 F.3d 1, 2 (D.C. Cir. 2014). As part of its industry oversight, FINRA sets professional rules of conduct for its members. *See Saad*, 718 F.3d at 907; *see also* 15 U.S.C. § 78o–3(b)(2). One such rule—FINRA Rule 2010—requires "[a] member, in the conduct of its business, [to] observe high standards of commercial honor and just and equitable principles of trade." FINANCIAL INDUSTRY REGULATORY AUTHORITY, FINRA MANUAL, FINRA RULES, Rule 2010.[1] The high ethical standards enforced by Rule 2010 are vital because "customers and firms must be able to trust securities professionals with their money." J.A. 111–112. Trustworthiness and integrity thus are essential to the functioning of the securities industry.

FINRA has developed "Sanction Guidelines," which elaborate upon the contours of its rules of conduct. As relevant here, the Guidelines provide that conversion and the improper use of funds or securities will violate Rule 2010. J.A. 93. Conversion is defined as "an intentional and unauthorized taking of and/or exercise of ownership over property by one who neither owns the property nor is entitled to possess it." *Id*. In cases of conversion, the Sanction Guidelines provide that "a [lifetime] bar is standard," "regardless of [the] amount converted." *Id*.

---

[1] http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=607.

In determining the appropriate sanction to be imposed for a violation of its rules, FINRA's Guidelines outline eight factors to be considered: (i) the need for the sanction to be remedial, to deter future misconduct, and to improve business standards in the securities industry, (ii) the violator's status as a repeat or one-time violator, (iii) the appropriateness of the sanction for the specific misconduct, (iv) the need in a particular case either to aggregate or to sanction individually similar violations, (v) the appropriateness of restitution or rescission, (vi) the remediation needed to ensure the individual does not benefit from ill-gotten gains, (vii) the necessity of requalification before permitting continued participation in the securities industry, and (viii) the violator's ability to pay any fine or restitution. J.A. 87–90.

In addition to those general principles, FINRA adjudicators must consider any other mitigating or aggravating factors. J.A. 91. FINRA's Sanction Guidelines provide a non-exhaustive list of nineteen potential aggravating or mitigating factors, including whether the violator (i) accepts responsibility for the misconduct, (ii) took voluntary corrective action prior to detection, (iii) engaged in a pattern of misconduct, (iv) perpetrated the misconduct over an extended period of time, (v) attempted to conceal the misconduct, (vi) acted intentionally, or (vii) was already disciplined by the FINRA member firm. J.A. 91–92.

The disciplinary process begins when FINRA's Department of Enforcement or Department of Market Regulation files a complaint with the FINRA Office of Hearing Officers. FINRA Rule 9211. A panel of hearing officers then conducts a disciplinary proceeding, FINRA Rule 9213, and issues a final written decision addressing both liability and remedial sanctions, FINRA Rule 9268.

5

Either FINRA or the violator may appeal to the National Adjudicatory Council, FINRA Rule 9311, which "may affirm, modify, reverse, increase, or reduce any sanction, or impose any other fitting sanction," FINRA Rule 9349(a). The Council then provides a proposed decision to the FINRA Board. FINRA Rule 9349(c). If no Board member calls for review of the Council's decision, it becomes final. *Id.*

The violator may then seek review of FINRA's decision by the Securities and Exchange Commission, FINRA Rule 9370, which superintends the disciplinary decisions of financial industry self-regulatory organizations like FINRA, 15 U.S.C. § 78s(d)–(e). The Commission conducts its own review of the disciplinary action, and may modify, affirm, or set aside the sanction. *Id.* § 78s(e)(1)(A)–(B). The Commission will set a remedial order aside if the order "imposes any burden on competition not necessary or appropriate" to further the purposes of the Securities Exchange Act, or if the sanction "is excessive or oppressive." *Id.* § 78s(e)(2).

**B**

**1**

John Saad was a regional director in the Atlanta Office of Penn Mutual Life Insurance Company, and was a FINRA-registered broker-dealer employed by Penn Mutual's affiliate Hornor, Townsend, & Kent, Inc. *Saad*, 718 F.3d at 906. Hornor, Townsend, & Kent, Inc. is a FINRA member firm. *Id.*

In July 2006, Saad scheduled a business trip from Atlanta, Georgia, to Memphis, Tennessee, but the trip was canceled at the last minute. *Saad*, 718 F.3d at 908; *see also* J.A. 107. Instead of going home to his wife and infant twins, Saad checked into an Atlanta hotel for two days. *Saad*, 718 F.3d at

908. Upon returning to his office, Saad submitted a false expense report for air travel to Memphis and a two-night stay in a Memphis hotel. *Id.* Attached to that false expense report were forged receipts for the fictitious airfare and hotel. *Id.*

Unconnected to the fabricated Memphis trip, Saad submitted another false expense report to his firm for a replacement cellphone. *Saad*, 718 F.3d at 908. Contrary to his representation in the expense report, Saad did not replace his own cellphone but instead purchased the cellphone for a female insurance agent at another firm. *Id.*; *see also* J.A. 62.

Saad's misconduct was soon discovered by an administrator in the Atlanta office of his firm because Saad submitted for reimbursement a receipt for four drinks purchased at an Atlanta hotel lounge on the same date that he was supposedly in Memphis. *Saad*, 718 F.3d at 908. When the administrator confronted him with the receipt, Saad grabbed the receipt and threw it away. *Id.* The administrator retrieved the receipt and sent it to Penn Mutual's home office. *Id.* In September 2006, Saad's employment was terminated. *Id.*

After Saad's termination, investigators from the National Association of Securities Dealers ("NASD")—FINRA's predecessor—questioned him about the false expense reports. *Saad*, 718 F.3d at 908. In a November 2006 email, Saad falsely told investigators that the fabricated trip report was "for a business trip that had yet to occur[.]" *Id.* Five months later, in April 2007, Saad falsely stated to investigators that he did not know the person for whom he had purchased the cellphone. *Id.* The next month, Saad untruthfully told examiners that he could not remember if he had purchased a plane ticket for the fabricated Memphis trip. *Id.*

In September 2007, FINRA brought a disciplinary proceeding against Saad alleging "Conversion of Funds" in violation of FINRA Rule 2010. *Saad*, 718 F.3d at 908.[2] The hearing panel found that Saad had violated Rule 2010. Saad, in his own defense, explained that he had been experiencing significant personal and professional stress at the time he submitted the false expense reports because his sales had declined and one of Saad's one-year old twins was suffering from a stomach disorder that required frequent hospitalizations. *Id.* The hearing panel imposed a bar that permanently forbade Saad from associating with any FINRA member firm in any capacity. *Id.* at 909.

Saad appealed, and the National Adjudicatory Council affirmed. *Saad*, 718 F.3d at 909. In reviewing the lifetime ban, the Council concluded that Saad's misconduct involved several aggravating factors, such as "the intentional and ongoing nature of Saad's misconduct, Saad's efforts to deceive [Hornor, Townsend, & Kent] and Penn Mutual, [and] Saad's initial instinct to conceal the extent of his actions from state and FINRA examiners." *Id.* at 909 (second alteration in original and citation omitted). The Council further determined that no mitigating factors counseled a lesser sanction. *Id.*

---

[2] Saad was initially investigated for and charged with violating National Association of Securities Dealers Rule 2110. *See Saad*, 718 F.3d at 909. NASD Rule 2110 is identical to FINRA Rule 2010. *Id.* at 907; *see also* FINANCIAL INDUSTRY REGULATORY AUTHORITY, FINRA MANUAL, NASD RULES, Rule 2110, http://finra.complinet.com/en/display/display_main.html?rbid=2403 &element_id=605 ("A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."). At the time Saad's disciplinary proceeding was formally initiated in September 2007, the SEC had "approved the consolidation of NASD with certain functions of the New York Stock Exchange to create" FINRA. *Saad*, 718 F.3d at 907.

The Securities and Exchange Commission affirmed, holding that, on this record, FINRA's sanction was not "excessive or oppressive." *Saad*, 718 F.3d at 909.

This court granted Saad's petition for review in part. We upheld the Commission's use of the Sanction Guideline governing conversion as a "starting point" for determining the appropriate sanction for Saad's two acts of misappropriation. *Saad*, 718 F.3d at 911. We remanded only because the Commission's analysis failed to address potentially mitigating factors, such as Saad's termination by his employer and Saad's personal and professional stress. *Id.* at 913. We left open the question whether the lifetime bar was an "excessive or oppressive" sanction, noting that the Commission had an obligation on remand to ensure its sanction was remedial rather than punitive. *Id.*

**2**

On remand, the Commission directed the National Adjudicatory Council to reconsider the imposition of the lifetime bar and, in particular, to address whether (i) a member firm's discipline of a rule violator prior to regulatory detection is a mitigating factor for the alleged violator, the member firm, or both, J.A. 36; (ii) the mitigating effect, if any, of Saad's termination prior to regulatory detection, J.A. 38; (iii) the mitigating effect, if any, of Saad's personal and professional stress, J.A. 39; (iv) any other mitigating considerations, J.A. 45; and (v) the appropriateness of the lifetime bar for Saad's misconduct, J.A. 49.

The Council determined that (i) prior discipline by a member firm may be mitigating for an individual violator, J.A. 37–38; (ii) Saad's termination prior to regulatory detection was

not mitigating on this record, J.A. 39; (iii) neither Saad's personal nor his professional stress was mitigating, J.A. 43–45; (iv) no other relevant mitigating factors existed in the case, J.A. 45–49; and (v) a permanent bar remained the appropriate remedy for Saad's misconduct, J.A. 49–50.

The Commission again affirmed. The Commission determined that Saad's repeated attempts over the course of seven months to conceal his misconduct from his employer and to mislead regulatory investigators were aggravating factors that supported FINRA's imposition of the permanent bar. J.A. 112. The Commission further concluded that the "'collateral consequences' of misconduct, including loss of employment, reputation, and income, [were] not mitigating" on the facts of this case because they provided "'no guarantee of changed behavior' and may not be enough to overcome [the Commission's] concern that he * * * 'poses a continuing danger to investors and other security industry participants (including would-be employers).'" J.A. 112–113 (quoting *Denise M. Olson*, Exchange Act Release No. 75837, 2015 WL 5172954, at *5 (Sept. 3, 2015)). The Commission also decided that, "under these circumstances," Saad's claims of professional and personal stress were not mitigating because his misconduct involved multiple instances of deliberate and deceptive conduct spread out over a long period of time, rather than a spontaneous or "unthinking" action triggered by stress and "later redressed." J.A. 113. The Commission found no mitigating value in Saad's arguments that his misconduct was "a series of blunders," his misappropriation did not involve customer funds, and he had a clean disciplinary record before his misappropriation. J.A. 114. Finally, the Commission reasoned that a permanent bar was the appropriate remedy in Saad's case because it "serves important deterrent objectives and reaffirms long-standing FINRA policy that such dishonesty by members or their associated persons will not be

tolerated." J.A. 115. Accordingly, the Commission affirmed the permanent bar finding it to be "remedial, not punitive," and "necessary to protect FINRA members, their customers, and other securities industry participants[.]" J.A. 115.

## II

We defer to the Commission's sanction decision if it is reasonable and reasonably explained, and will overturn it only if it is "arbitrary, capricious, or an abuse of discretion." *Saad*, 718 F.3d at 910 (quoting *Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010)).

## A

This court's prior decision remanded for the Commission to address Saad's mitigating evidence. *Saad*, 718 F.3d at 913-914. Saad now contends that the Commission failed to give his mitigating evidence sufficient heed. We disagree. The Commission reasonably balanced the relevant mitigating and aggravating factors before determining that the gravity of Saad's behavior warranted remedial action.

*First*, with respect to the mitigating relevance of Saad's termination by his employer for misconduct, the Commission recognized that a FINRA Sanction Guideline provides that disciplinary action prior to regulatory detection may be considered mitigating. J.A. 112–113 (noting FINRA Principal Consideration in Determining Sanctions #14). But the Commission explained that his termination carried little weight in this case because "Saad repeatedly used dishonest means to overcome personal and professional disappointments and obstacles, and to mislead his employer and regulators." J.A. 113. Given those facts, the Commission reasonably concluded that "termination, while mitigating under certain

circumstances, [did not] overcom[e] the threat [Saad] would pose to investors and other securities industry participants were he to return to the industry." J.A. 113.

*Second*, the Commission credited Saad's claims of personal and professional stress. The Commission nevertheless found them to lack mitigating force in this case because Saad's conduct was not a momentary or impulsive action driven by stress, but instead involved "deceptive conduct demonstrat[ing] a high degree of intentionality over a long period of time." J.A. 113. The Commission found it particularly significant that (i) Saad had not discussed the professional setbacks he was undergoing with his firm or otherwise sought assistance; (ii) his deception required planning and research; and (iii) he "methodically forg[ed] hotel and airfare receipts that bore logos that he had copied from the internet." J.A. 113. In addition, the Commission stressed that Saad did not own up to his missteps when the firm administrator confronted him about the fabricated expense report, but instead tried to destroy the evidence and repeatedly misled investigators for at least seven more months. J.A. 114. On top of that, Saad engaged in a second act of misappropriation by using firm funds to purchase a cellphone for a person who worked at another firm. J.A. 114. The Commission reasonably concluded that a pattern of such prolonged and repeated misbehavior could not be attributed to stress. J.A. 114.

*Third*, the Commission fairly addressed Saad's arguments that his misconduct did not involve the misappropriation of *customer* funds, and that he otherwise had a clean disciplinary record. J.A. 114. The Commission explained that it had not differentiated between the source of mistreated funds in the past, upholding bars even though "the underlying dishonesty did not relate directly to customers." J.A. 114; *see also* J.A.

114 n.24 (citing disciplinary proceedings involving misappropriation of non-customer funds). That makes sense. As the Commission previously has explained, it is the deception and fraud in the handling of others' property that endangers the integrity of the securities industry, and that threat remains the same whether the victim is a trusting employer or trusting client. *See Richard Dale Grafman*, Exchange Act Release No. 21648, 1985 WL 548687, at *2 (Jan. 14, 1985) (upholding a sanction even though the conduct did not involve public customers because "[t]he securities business presents a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants").

The Commission further noted that it has "repeatedly held that a clean disciplinary record is not mitigating." J.A. 114; *see also* J.A. 114 n.25 (citing a disciplinary proceeding holding that the lack of a disciplinary history is not mitigating); J.A. 91 n.1 (FINRA Sanction Guidelines manual, citing *Rooms v. SEC*, 444 F.3d 1208, 1214–1215 (10th Cir. 2006), for the proposition that disciplinary history can serve only as an aggravating factor and its absence cannot be mitigating). There is nothing unreasonable about the Commission concluding that individuals in a profession that depends critically on public trust and honesty are already expected to have a clean record, so it is not something for which they get extra credit. *See Rooms*, 444 F.3d at 1214 (noting that the violator "was required to comply with NASD's high standards of conduct at all times"); *see also World Trade Fin. Corp.*, Exchange Act Release No. 66114, 2012 WL 32121, at *16 (Jan. 6, 2012) ("[F]irms and their associated persons should not be rewarded for acting in accordance with their duties.").

Accordingly, we hold that the Commission's thoroughgoing decision directly addressed the mitigating evidence, as required by our prior remand order, and provided

a careful and comprehensive analysis of Saad's arguments seeking a reduction in his sanction. Its decision reasonably focused on the record of Saad's prolonged pattern of falsehoods and deception, as well as the direct threat that his misconduct posed to customers' and other participants' faith in the integrity of the securities industry.

**B**

Saad also challenges the Commission's affirmance of FINRA's lifetime bar on his affiliation with FINRA and its members as impermissibly punitive. We remand that question to the Commission to address, in the first instance, the relevance—if any—of the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). Accordingly, Saad's petition for review is denied in part and remanded to the Commission in part.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring: I add this brief concurrence to explain why I believe the Court is correct to remand this case to the SEC.

Our precedents say that the SEC may approve expulsion or suspension of a securities broker as a remedy, but not as a penalty. Our cases in turn have upheld various expulsions or suspensions as remedial. *See, e.g.*, *PAZ Securities, Inc. v. SEC*, 566 F.3d 1172, 1175-76 (D.C. Cir. 2009). Our use of the term "remedial" to describe expulsions or suspensions finds its roots in a single, unexplained sentence in a 77-year-old Second Circuit case. *See Wright v. SEC*, 112 F.2d 89, 94 (2d Cir. 1940). Applying those precedents here, the SEC concluded that the lifetime expulsion of Saad from the securities industry was permissible because the sanction was remedial, not punitive.

My fundamental problem with this line of cases is that the term "remedial" makes little sense when describing the expulsion or suspension of a securities broker. Like other punitive sanctions, expulsion and suspension may deter others and will necessarily deter and prevent the wrongdoer from further wrongdoing. Expulsion and suspension may thereby protect the investing public. But expulsion and suspension do not provide a remedy to the victim. Under any common understanding of the term "remedial," expulsion and suspension of a securities broker are not remedial. Rather, expulsion and suspension are punitive.

Of course, as a three-judge panel, we ordinarily must stick with our precedents. But here, the Supreme Court's recent decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), means that we can no longer characterize an expulsion or suspension as remedial. After the Supreme Court's decision in *Kokesh*, in other words, our precedents characterizing expulsions or suspensions as remedial are no longer good law.

In *Kokesh*, the Supreme Court ruled that disgorgement paid to the Government is a "penalty" subject to the five-year statute of limitations in 28 U.S.C. § 2462. 137 S. Ct. at 1643-45, slip op. at 7-11. The Court reasoned that the disgorged money often does not go to victims and, moreover, is not limited to the amount of harm to victims – both of which would be required if the sanction were truly remedial rather than punitive. *See id.* at 1644-45, slip op. at 9-11. The Court stated: "Sanctions imposed for the purpose of deterring infractions of public laws are inherently punitive because deterrence is not a legitimate nonpunitive governmental objective." *Id.* at 1643, slip op. at 8 (internal quotations omitted). And the Court added: "A civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* at 1645, slip op. at 11 (internal quotations omitted). Notably, the Supreme Court's decision in *Kokesh* overturned a line of cases from this Court that had concluded that disgorgement was remedial and not punitive. *See, e.g.*, *Zacharias v. SEC*, 569 F.3d 458, 471-72 (D.C. Cir. 2009).

As I see it, the *Kokesh* analysis matters here. The Supreme Court's reasoning in *Kokesh* was not limited to the specific statute at issue there. Like disgorgement paid to the Government, expulsion or suspension of a securities broker does not provide anything to the victims to make them whole or to remedy their losses. Therefore, in light of the Supreme Court's analysis in *Kokesh*, expulsion or suspension of a securities broker is a penalty, not a remedy.

Judge Millett's separate opinion cites cases such as *Smith v. Doe*, 538 U.S. 84 (2003), for the proposition that occupational debarments are not punitive. But the question in *Smith v. Doe*, for example, was whether a particular sanction

(there, required registration as a sex offender) was civil or criminal for purposes of the Ex Post Facto Clause. Some penalties are civil, and some penalties are criminal. The question of whether a penalty is civil or criminal is distinct from (although overlapping with) the question of whether a sanction is a penalty rather than a remedy. *See Hudson v. United States*, 522 U.S. 93, 105 (1997) (civil penalty at issue there was not "criminally punitive" for double jeopardy purposes). As I read it, nothing in *Smith v. Doe* or any of the other Supreme Court cases cited by Judge Millett's separate opinion says or suggests that occupational debarment is a remedy.

Judge Millett's separate opinion also states that Saad forfeited any argument that the sanction here was punitive, not remedial. I respectfully disagree. Saad expressly argued both to the SEC and to this Court that the lifetime expulsion in his case was punitive, not remedial. He of course did not cite *Kokesh* because *Kokesh* was not yet decided at the time. In my view, Saad preserved the argument that the sanction imposed on him was a penalty, not a remedy.

Judge Millett's separate opinion distinguishes this case from ordinary civil penalty cases by relying on FINRA's status as a self-regulatory organization. But by statute, FINRA is heavily regulated by the SEC, and a FINRA-sanctioned party has a right to appeal FINRA sanctions to the SEC. *See* 15 U.S.C. § 78s; 78s(d).[1]  FINRA is therefore not akin to, for

---

[1] "In their review of disciplinary orders, the federal courts of appeals do not distinguish between SEC orders that affirm FINRA disciplinary sanctions and SEC orders that affirm sanctions imposed through the SEC's administrative hearing system; both are considered SEC orders. Accordingly, parties rarely raise the objection that FINRA is not a government body, and if the objection is raised, courts quickly dispense with it." Barbara Black, *Punishing*

example, a state bar association or the National Football League – organizations that may impose discipline without statutorily required review by a federal agency.

In appeals from FINRA sanctions, the SEC must determine whether the FINRA-imposed sanctions are "excessive or oppressive." 15 U.S.C. § 78s(e)(2). Our pre-*Kokesh* cases in turn say that the SEC may uphold FINRA sanctions as not being excessive or oppressive if the sanctions are remedial, not punitive. *See Siegel v. SEC*, 592 F.3d 147 (D.C. Cir. 2010); *Paz*, 566 F.3d at 1175-76. And our pre-*Kokesh* cases further say that an expulsion or suspension can be considered remedial, not punitive.

My sole point here is to cast doubt on our pre-*Kokesh* cases' characterization of an expulsion or suspension as remedial rather than punitive. My point is not to suggest that FINRA lacks power to impose punitive sanctions such as expulsions or suspensions. After all, FINRA Rule 8310 expressly allows FINRA to impose expulsions and suspensions in appropriate cases. *See also* 15 U.S.C. § 78o-3(b)(7) (authorizing FINRA to impose expulsions or suspensions). And the SEC may still approve an expulsion or suspension if such a FINRA-imposed sanction is an appropriate (that is, not "excessive or oppressive") penalty in particular cases. The question here therefore is whether the lifetime expulsion of Saad – what our prior opinion in this case called the "securities industry equivalent of capital punishment," *Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013) – was a permissible and appropriate penalty under the relevant statutes and regulations.

---

*Bad Brokers: Self-Regulation and FINRA Sanctions*, 8 BROOK. J. CORP., FIN. & COMM. L. 23, 41-42 (2013).

If FINRA and the SEC can still impose expulsions and suspensions in certain cases, why does the terminological distinction matter? In other words, why should we care that FINRA and the SEC must characterize certain sanctions as punitive rather than remedial? One answer is this: If FINRA and the SEC must justify expulsions or suspensions as punitive (as I believe they must after *Kokesh*), they will have to explain why such penalties are appropriate under the facts of each case. FINRA and the SEC will no longer be able to simply wave the "remedial card" and thereby evade meaningful judicial review of harsh sanctions they impose on specific defendants. Rather, FINRA and the SEC will have to reasonably explain in each individual case why an expulsion or suspension serves the purposes of punishment and is not excessive or oppressive. Over time, a fairer, more equitable, and less arbitrary system of FINRA and SEC sanctions should ensue. *Cf.* 18 U.S.C. § 3553(a).[2]

With those observations, I join the Court's decision to remand the case to the SEC for the Commission to address in the first instance whether, in light of *Kokesh*, the penalty imposed on Saad was excessive or oppressive.

---

[2] Judge Millett's separate opinion suggests that the SEC on remand should not and, indeed, may not change its approach to this issue in the wake of *Kokesh*. To state the obvious, her separate opinion speaks for only one judge, as does my separate opinion. If a majority of the panel agreed with all of the sentiments expressed in Judge Millett's separate opinion, we presumably would not be remanding the case. If a majority of the panel agreed with all of the sentiments expressed in my separate opinion, we presumably would be remanding the case with specific directions about *Kokesh*. Instead, the Court is remanding for the SEC, in the first instance, to address the relevance of *Kokesh*. The *Kokesh* issue remains undecided for now in this Court.

MILLETT, *Circuit Judge, dubitante regarding Part II.B*:

I have grave doubts about the propriety of remanding this case to the Commission yet again. This time, the remand seeks the Commission's views on the relevance—if there is any at all—of *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). But in my view, the Commission amply explained the remedial reasons for sustaining FINRA's permanent bar on Saad's affiliation with it and its members, and there is nothing in *Kokesh* that helps Saad. That presumably is why Saad himself has not whispered a word to this court about *Kokesh* having any bearing upon his case. Not one word. Accordingly, adding another round to this already decade-long saga does not seem worth the candle. Nor does further delay seem fair to FINRA's efforts to protect the integrity of the securities industry from securities brokers who exploit and abuse the trust of their employers and the investing public.

In my view, the Commission did exactly what our earlier decision flagged for remand: It addressed Saad's mitigating evidence and quite reasonably concluded that FINRA's permanent bar on Saad's affiliation with its members is remedial, rather than "excessive or oppressive," 15 U.S.C. § 78s(e)(2). The Commission's affirmance of FINRA's decision about how best to deal with Saad's pattern of serious professional misconduct echoes the Supreme Court's recognition of "how essential it is that the highest ethical standards prevail in every facet of the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186–187 (1963) (quotation omitted); *see Kokesh*, 137 S. Ct. at 1640 n.1.

In addition, in imposing Saad's bar, FINRA hewed to the remedy its Sanction Guidelines recommend, which we previously held FINRA could properly extend to this case. *See Saad v. SEC*, 718 F.3d 904, 911 (D.C. Cir. 2013) (upholding

FINRA's reliance on the Sanction Guideline for conversion or improper use because "misappropriation is doubtless analogous to conversion") (internal quotation marks and citation omitted). That Sanction Guideline reflects a deliberate and objective assessment of the type of remedy needed to protect the securities industry and the investing public from misconduct involving mendacity and the misuse of entrusted property—misdeeds that strike at the heart of the investing public's trust in the securities industry. FINRA's evenhanded application of that prescribed remedy supports the sanction's remedial character.

As the Commission also explained, FINRA's determination in this case to permanently bar Saad from registering with FINRA or affiliating with its members was tailored to the individual circumstances of his case and Saad's serious and serial misconduct. In addition to two separate acts of misappropriating property entrusted to him—the fabricated Memphis trip and the abusive use of employer funds to purchase a cellphone for someone else—Saad forged documents, attempted to hide evidence of his misconduct after it was discovered by the Atlanta administrator, and deliberately deceived and misled regulators for more than half a year as they investigated his misconduct. The Commission thus had an adequate factual foundation to sustain FINRA's judgment that "Saad's actions betray a dishonest character * * * [and] demonstrate that he cannot be entrusted with firm or customer money[.]" J.A. 115. In an industry the functioning of which is predicated on the public trust, "[c]haracter is as important a qualification as knowledge[.]" *Hawker v. New York*, 170 U.S. 189, 191 (1898). For the same reason, the Commission reasonably concluded that Saad "would pose a continuing and unacceptable threat to investors and other industry participants if not barred." J.A. 115; *see Kokesh*, 137 S. Ct. at 1640 n.1 (emphasizing the need to "achiev[e] a high standard of business

ethics in the securities industry") (quoting *Capital Gains Research Bureau*, 375 U.S. at 186).

Given all of that, *Kokesh* is of no help to Saad. *Kokesh* held only that "[d]isgorgement" ordered by the Commission in "enforcement proceedings" prosecuted by the Commission itself to punish violations of "public law" "operates as a penalty under [28 U.S.C.] § 2462," 137 S. Ct. at 1644, 1645. In multiple respects, that bears no resemblance to FINRA's private decision in this case to disaffiliate from Saad because of his repeated violations of FINRA's own professional rules of conduct.

*First*, the two cases implicate quite different remedial schemes and materially different statutory standards. As noted, *Kokesh* interpreted the term "penalty" under 28 U.S.C. § 2462, which prescribes a five-year statute of limitations for the imposition of any "civil fine, penalty, or forfeiture, pecuniary or otherwise" in proceedings brought to enforce Acts of Congress.

Commission review in this case, by contrast, does not involve a governmental entity enforcing an Act of Congress, federal regulation, or any other type of public law. Instead, in this case, the Commission is exercising discretionary superintendence over the decisions of a private self-regulatory organization (FINRA) to ensure only that its disciplinary decisions do not "impose[] any burden on competition not necessary or appropriate" and are not "excessive or oppressive." 15 U.S.C. § 78s(e)(2). If they are, the Commission "may" alter them. *Id*.

Those distinctions are critical. *Kokesh* is quite explicit that the defining feature of a "penalty" under 28 U.S.C. § 2462 is that it is "imposed as a sanction for violating *federal securities*

*law*." *Kokesh*, 137 S. Ct. at 1639 (emphasis added). Indeed, "violating a *public law*" is a "hallmark[] of a penalty." *Id.* at 1644; *see id.* at 1643 ("SEC disgorgement is imposed by the courts as a consequence for violating what we described in *Meeker* as public laws.") (emphasis added); *id.* ("Sanctions imposed for the purpose of deterring infractions of *public laws* are inherently punitive[.]") (emphasis added); *id*. at 1641 ("The Commission sought civil monetary penalties, disgorgement, and an injunction barring Kokesh from violating *securities laws* in the future.") (emphasis added).

By contrast, all that Saad is charged with violating—and all that is being remediated in this proceeding—is FINRA's rules of professional conduct. *See* J.A. 109 ("FINRA instituted disciplinary proceedings * * * alleging [a] * * * violation of *NASD Rule* 2110.") (emphasis added); J.A. 110 ("'[P]ersonal problems' could be mitigating if they 'interfered with an ability to comply with *FINRA rules*[.]'") (emphasis added).

The Supreme Court has ruled time and again that such "occupational debarment" is a "nonpunitive" sanction. *See Hudson v. United States*, 522 U.S. 93, 104 (1997) (order forbidding further participation in the banking industry is a nonpunitive sanction); *see also De Veau v. Braisted*, 363 U.S. 144, 156–160 (1960) (barring certain persons from work as union officials); *Hawker*, 170 U.S. at 194–200 (permitting the revocation of a medical license); *see generally Smith v. Doe*, 538 U.S. 84, 100 (2003).[1]

_____

[1] The Concurring Opinion dismisses the Supreme Court's debarment cases by suggesting that such discipline is, as a matter of law, a civil "penalty," and thus automatically "excessive or oppressive." Concurring Op. 3. But in upholding those measures, the Supreme Court recognized the important remedial role that such debarments can play in protecting the integrity of an industry and those members of the public who interact with it. *See Hudson*, 522 U.S. at 105

This case is even easier than those Supreme Court cases. The question of whether debarments (or even suspensions, as the Concurring Opinion suggests) are "excessive or oppressive" is, at bottom, a pure question of statutory construction. And on that question, Congress has *mandated* that any securities-industry self-regulatory organization that wishes to register with the Commission include in its rules the ability to "discipline[]" members who violate "the rules of the association" by, *inter alia*, "expulsion, suspension, * * * [and] being suspended or barred from being associated with a member." 15 U.S.C. §78*o*-3(b)(7); *see id*. §78*o*-3(h)(3). Disciplinary tools required by Congress in Section 78*o*-3 cannot categorically be impermissibly "excessive or oppressive" under Section 78s(e)(2).[2]

*Second*, *Kokesh* involved an order of disgorgement commanding the payment of funds into the United States Treasury. That sanction thus did nothing to protect or to compensate the victims of the crime. *Kokesh*, 137 S. Ct. at 1644 ("When an individual is made to pay a noncompensatory sanction *to the Government* as a consequence of a legal violation, the payment operates as a penalty.") (emphasis added); *id*. ("SEC disgorgement thus bears all the hallmarks of a penalty: It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate.").

---

(holding that ancillary deterrence effects are not dispositive when a sanction's main purpose is "to promote the stability of the banking industry"); *Hawker*, 170 U.S. at 192 (upholding character requirements for medical licensing because of the "most intimate" relationship between the medical profession and the "life and health" of the general public).

[2] Section 78*o*-3 does not mention disgorgement.

By contrast, Saad's offense harmed FINRA's members not just by misappropriating his employer's money, but also by imperiling, through both his fraud and his deceitful cover-up, the trust and confidence of the investing public that is the lifeblood of the securities industry. Saad's seven-month-long obstruction of investigators also squandered FINRA's and its members' resources, forcing them to expend time, personnel, and money unravelling the truth from his falsehoods. Under these circumstances, allowing an industry to protect itself and its clients from Saad's mendacity and purloining by disassociating from him is a remedial measure that protects the industry and its investors. *See* J.A. 115 ("Because we conclude that a bar is necessary to protect FINRA members, their customers, and other securities industry participants, we find that it is remedial, not punitive."); *see also id.* ("[Saad's actions] demonstrate that he cannot be entrusted with firm or customer money, and that therefore he would pose a continuing and unacceptable threat to investors and other industry participants if not barred."). Saad's discipline, unlike Kokesh's, does not surrender anything "to the Government." 137 S. Ct. at 1644. The remedy here thus bears no punitive resemblance to the disgorgement order in *Kokesh*.

*Third*, given the significant differences in the two statutory schemes, Saad cannot wrap himself in *Kokesh* without first establishing that the meaning of "penalty" in 28 U.S.C. § 2462's statute of limitations governing the enforcement of Acts of Congress both (i) directly dictates the meaning of "excessive or oppressive" under 15 U.S.C. § 78s(e)(2), *and also* (ii) overrides the Commission's discretionary judgment whether to correct a FINRA disciplinary measure, thereby mandating relief in his case, *cf. id.* (Commission "may" correct orders).

Saad, however, has never argued in any way at any point in these proceedings that we should extrapolate the meaning of "penalty" under 28 U.S.C. § 2462 to the determination of whether a sanction is "excessive or oppressive" under 15 U.S.C. § 78s(e)(2). Saad made no such argument before FINRA or the Commission. And before this court—giving Saad every benefit of the doubt—he at most indirectly bumped into the point by citing a case that arose under Section 2462—and even that appeared for the first time in his reply brief. Saad Reply Br. 2 (mentioning a case that involved a proceeding under 28 U.S.C. § 2462, but not citing the statute or arguing its extension to this context); *see* 15 U.S.C. § 78y(c)(1) ("No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so."); *United States v. TDC Mgmt. Corp.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016) (undeveloped arguments are forfeited); *American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("We need not consider this argument because plaintiffs have forfeited it on appeal, having raised it for the first time in their reply brief.").

More to the point, Saad himself apparently sees no relevance to the Supreme Court's decision in *Kokesh* because, in the five months since *Kokesh* was decided, he has not said a single word to this court about that decision or its potential applicability. Because Saad himself does not consider the decision worth mentioning and has never argued at any point that 28 U.S.C. § 2462's definition of "penalty" controls this very different statutory scheme enforcing a different statutory standard ("excessive or oppressive"), he has forfeited any reliance on that argument. Or so the Commission could sensibly conclude.

*Fourth*, binding circuit precedent—indeed, law of the case—has established that the Commission "may approve 'expulsion not as a penalty but as a means of protecting investors.'" *Saad*, 718 F.3d at 913 (quoting *PAZ Securities, Inc. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007)). *See also Siegel v. SEC*, 592 F.3d 147, 158 (D.C. Cir. 2010) (consecutive suspensions permissibly imposed "to protect customers") (internal quotation marks omitted); *PAZ Securities, Inc. v. SEC*, 566 F.3d 1172, 1175 (D.C. Cir. 2009) (debarment permissibly imposed "to protect investors" and to redress "a significant harm to the self-regulatory system"); *McCurdy v. SEC*, 396 F.3d 1258, 1265 (D.C. Cir. 2005) (suspension permissibly imposed "to protect the public from [the violator's] demonstrated capacity for recklessness").

This court is not alone in that judgment. *See, e.g.*, *ACAP Fin., Inc. v. SEC,* 783 F.3d 763, 768 (10th Cir. 2015) (Gorsuch, J.) (suspension permissibly imposed where the violator's conduct "cast doubt on his ability to carry out his obligations as a securities professional in any capacity"). The Eighth Circuit, moreover, recently ruled that nothing in *Kokesh* called into question the authority of the Commission to sustain a disciplinary order enjoining the continued violation of the securities laws. That prospective order remained remedial because it was designed "to protect the public prospectively[.]" *SEC v. Collyard*, 861 F.3d 760, 764 (8th Cir. 2017) (discussing *Kokesh*).

Nothing in *Kokesh* unravels our on-point circuit precedent. *Kokesh* involved a different sanction (disgorgement), imposed under a different statute under an entirely different type of Commission proceeding, to enforce public law not industry professional standards, and involved markedly different remedial and protective implications for private industry and private investors. Accordingly, nothing in *Kokesh* "effectively

overrules" or "eviscerates" that binding precedent, which is what we require before abandoning law of the circuit. *See National Inst. of Military Justice v. Department of Defense*, 512 F.3d 677, 682-683 n.7 (D.C. Cir. 2008) ("[W]hether [a] Supreme Court opinion supersedes Circuit precedent * * * depends on whether [that] opinion 'effectively overrules,' i.e. 'eviscerates' precedent") (quoting *United States v. Williams*, 194 F.3d 100, 105 (D.C. Cir. 1999)).

Accordingly, under settled authority, the Commission's affirmance of a FINRA debarment decision is not "excessive or oppressive" when it is designed, as it was here, to remedially protect the industry and the investing public. This panel, and any panel reviewing the Commission's decision on remand, is bound by that precedent, and (absent an intervening en banc ruling) will continue to be bound by that precedent on review of any subsequent SEC decision. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).[3]

The foundational premise of the Concurring Opinion is that only disciplinary sanctions that "provide a remedy to the victim" can qualify as "remedial." Concurring Op. 1; *see id*. at 2. But *Kokesh* does not go anywhere near that far. More to the point, it says nothing at all about what constitutes a remedial sanction in the context of a self-regulatory organization's enforcement of its professional standards, rather than public laws. This circuit has ruled that, in this exact statutory context,

---

[3] The Concurring Opinion says that *Kokesh* overturns circuit precedent characterizing "expulsion[s] or suspension[s]" as remedial. Concurring Op. 1. But the Concurring Opinion cites no language in *Kokesh* that even suggests such a sweeping holding, let alone that clearly "eviscerates" our precedent. Nor does the Concurring Opinion grapple with our strict circuit standard for relying upon intervening Supreme Court precedent to abandon circuit precedent.

a disciplinary sanction that is "purely remedial and preventative" but *not* compensatory—such as a general order to cease-and-desist violating the securities laws—is "not a 'penalty' or 'forfeiture'" within the meaning of 28 U.S.C. § 2462. *Riordan v. SEC*, 627 F.3d 1230, 1234 (D.C. Cir. 2010); *see id.* at 1232 (labeling the cease-and-desist order "remedial"). A prospective cease-and-desist order of that general breadth "does not provide anything to the victims to make them whole or to remedy their losses," as the Concurring Opinion would require. Concurring Op. 2. Yet it certainly is remedial to ensure that, going forward, a harm stops.

The Concurring Opinion says that debarment and even a one-day suspension have to be treated as a penalties because, in its view, they do not "provide a remedy to the victim." Concurring Op. 1. But that argument conflates "remedial" with "compensatory." Victimization and harm entail more than just replacing lost dollars. There can be non-pecuniary harms too. There certainly were here. The harm that Saad inflicted and that FINRA remedied did not stop with his employer's bank account. His conduct also sowed distrust in the industry, and his seven months of falsehoods and misrepresentations to regulatory investigators stole their time and scarce resources, while compounding the harms he caused to industry integrity.

FINRA's order of debarment directly remedied that full range of harms by making sure they stopped. Ordering the fox out of the henhouse falls comfortably within the "common understanding of the term 'remedial,'" Concurring Op. 1, and indeed provides to Saad's many victims a more comprehensive

and realistic remedy than the Concurring Opinion's dollars-only approach.[4]

In sum, Saad's repeated turpitudinous misconduct, his nearly year-long venture in misleading and lying to his employer and investigating regulators, and the paramount need for the utmost honesty and integrity in the handling of others' property in the securities industry amply justified the Commission's decision to sustain FINRA's imposition of debarment as a remedy in this case. I do not see anything in *Kokesh* that bears on that decision by a private self-regulatory organization to disaffiliate with someone who repeatedly transgressed industry rules that are necessary to protect the investing public and the integrity of the securities industry. For those reasons, I have deep doubts about the decision to remand this case to the Commission to address a case that is so off-point that Saad himself has paid it no heed, especially because the remedial sufficiency of the Commission's order is controlled by circuit precedent. I have gone along only because

---

[4] The Concurring Opinion's suggestion that FINRA "may" somehow be able to impose "civil penalt[ies]" is quite puzzling. Concurring Op. 4. Civil penalties punish violations of federal law, not private industry rules. *See*, *e.g.*, *Kokesh*, 137 S. Ct. at 1639, 1644. And nothing in the relevant federal securities laws empowers a *non-governmental* body like FINRA to prosecute and punish violations of *federal law* directly. Nor does federal law provide any avenue by which the Commission "may" be able to review FINRA's prosecution of civil penalties. Concurring Op. 4. More puzzling still is the Concurring Opinion's suggestion that FINRA was supposed to justify Saad's debarment as "punitive." Concurring Op. 4-5. This court remanded this case to the Commission to explain why its disciplinary measures were *not* "punitive." *Saad*, 718 F.3d at 913. Thankfully, law of the case and law of the circuit foreclose the Concurring Opinion's volte-face.

nothing in our simple remand order says that *Kokesh* should alter the outcome of Saad's case.